UNITED STATES of America,
Plaintiff–Appellee,

v.

Leslie RUSSELL, Defendant–Appellant.

No. 96–3039.

United States Court of Appeals,
Tenth Circuit.

Feb. 27, 1997.

Rehearing Denied March 26, 1997.

Timothy J. Henry, Assistant Federal Public Defender, Wichita, Kansas, for Defendant–Appellant.

T.G. Luedke, Assistant U.S. Attorney, Topeka, Kansas, for Plaintiff–Appellee.

Before WHITE, Associate Justice (Ret.); * EBEL, and KELLY, Circuit Judges.

WHITE, Associate Justice (Ret.).

A federal jury found Leslie Russell guilty of conspiring with codefendant Michon

* The Honorable Byron R. White, Associate Justice of the United States Supreme Court, (Ret.), sit-

Starnes, in violation of 21 U.S.C. § 846, to possess with intent to distribute approximately 18 grams of cocaine base. Russell asserts various errors in her trial. We affirm.

## I. FACTS

On June 17, 1994, law enforcement officers from Junction City, Kansas, executed a valid search warrant at the residence of Michon Starnes. It is uncontested that the police found 18 grams of cocaine along with drug paraphernalia and $400 in cash in Starnes's bedroom. See Def.Br. at 5. The government's case also included testimony from a number of police officers and an informant, Derrick Douglas, about contemporaneous and prior drug transactions involving Starnes and Russell. The most damaging piece of this testimony was that Douglas saw Russell walk into Starnes's home with an ounce of cocaine and emerge without it.

Starnes and Russell were tried together. They were both convicted of the § 846 conspiracy violation; the jury hung on straight possession counts against both and a firearm count against Starnes. In this appeal, which concerns Russell only, she raises the following issues regarding her conviction: (1) that the evidence was insufficient to support her conspiracy conviction; (2) that the district court abused its discretion in denying a continuance when Russell attempted to present two witnesses she had not disclosed; (3) that the conspiracy charge to the jury failed to adequately state the law; and (4) that the prosecution's closing remarks amounted to misconduct requiring a new trial.

## II. SUFFICIENCY OF THE EVIDENCE

We first evaluate Russell's contention that the evidence in this case was insufficient to sustain the verdict. Russell argues that the evidence was insufficient because it consisted primarily of testimony by informant Douglas, which, according to Russell, was unreliable

ting by designation, pursuant to 28 U.S.C.

and inadmissible under Federal Rule of Evidence 404(b). She also contends that she received inadequate notice of the testimony.

We disagree. The evidence was sufficient in this case if a reasonable jury, granting all favorable inferences to the government, could have concluded beyond a reasonable doubt that Russell was guilty of the conspiracy. See United States v. Urena, 27 F.3d 1487 (10th Cir.), cert. denied, 513 U.S. 977, 115 S.Ct. 455, 130 L.Ed.2d 364 (1994). As we hold in Part IV, the trial court's instruction properly defined the elements of conspiracy which the government had to prove as:

> What the evidence [in] this case must show beyond a reasonable doubt is:
>
> (1) That two or more persons in some way or manner, positively or tacitly, came to a mutual understanding to try to accomplish a common and unlawful plan, as charged in the Indictment; and
>
> (2) That the defendants willfully became members of such conspiracy.

Instr. # 9, R.O.A. Vol. II, at 99–100. The evidence was sufficient to support the conspiracy charge here.

■ First, the government introduced direct evidence that was sufficient to establish Russell's guilt. Russell does not dispute that police found 18 grams of cocaine along with drug paraphernalia and $400 in cash in Starnes's bedroom. See Def.Br. at 5. The government produced testimony that this evidence was indicative of a drug distribution organization. Investigator Mike Life testified that the confiscated items included foil to wrap the cocaine in small amounts (matching the foil in which the cocaine was stored), a weighing scale, and a loaded handgun. R.O.A. Vol. VIII, at 130–58. These items, according to Investigator Life, were consistent in his experience with a "stash" or "safe" house where drugs were stored for sale. Id. at 166–67. Life further gave his opinion that the seized cocaine had a street value of about $11,000—certainly in excess of a typical user amount. Id. at 165–66. Paul

§ 294(a).

Marquardt, a Special Agent with the U.S. Bureau of Alcohol, Tobacco, and Firearms, corroborated this "safe house" evaluation. R.O.A. Vol. X, at 499–511.

Having introduced evidence from which the jury could infer a drug distribution network, the government then linked Russell to that conspiracy. Derrick Douglas testified that, on June 16, 1994 (i.e., within the scope of the indictment), Russell contacted him with highly incriminating information. Informing Douglas that she had just returned from a trip to Chicago, she showed him a one-ounce rock of cocaine. R.O.A. Vol. VIII, at 238–39. The two of them then travelled to Starnes's residence, Douglas testified, in a car that Russell had borrowed from Starnes. *Id.* at 238–40. Russell then entered Starnes's residence with the rock of cocaine, and emerged later no longer carrying it. *Id.* Detective Brian Vessar buttressed Douglas in this regard, testifying that Douglas previously told him this story, which provided the basis for the search warrant. R.O.A. Vol. VII, at 7–8. Just prior to the search, Russell was seen driving away in Starnes's car.

Douglas also testified about another incident which indicated Russell's guilt. Douglas told the jury that, shortly before the trial, Russell threatened him. Accompanied by two males, she warned Douglas that if he testified against her she would have him killed. One of the men then struck Douglas in the back of the head to punctuate the threat. R.O.A. Vol. VIII, at 242–43. Sergeant Robert Storey supported Douglas's testimony by testifying that Douglas had supplied reliable information to the police department in the past. A reasonable jury could conclude from this evidence, beyond a reasonable doubt, that Russell conspired with Starnes to possess cocaine with intent to distribute it.

Russell's attempts to undercut this testimony rest on three faulty premises. The first is that Douglas could not attest to the fact that the seized cocaine was the cocaine he saw. But such a chain of custody is not necessary. The jury could make this reasonable inference. Moreover, Russell was convicted of conspiracy to possess (with intent to distribute)—not with actual possession. It is not necessary, therefore, that the cocaine seized by the police be the same as the cocaine Douglas saw. Rather, the existence of two cocaine stashes and the relationship of Starnes and Russell could establish the charged conspiracy. Russell's second attack on Douglas's direct testimony regards his alleged unreliability as a government informant who "cut a deal." Russell was, of course, free (and did) argue the credibility issue to the jury. The Court does not make credibility determinations when it evaluates the sufficiency of the evidence. *See United States v. Pearson,* 798 F.2d 385, 387 (10th Cir.1986). The third (and related) premise is that this Court may reweigh the evidence for the jury. It may not. *See id.* Much of Russell's argument is devoted to rehashing defenses: she argues that the cocaine did not belong to Starnes because another resident of the house testified she did cocaine in Starnes's bedroom, and that Russell could not be guilty because she did not tip off Starnes to the pending search although, she contends, she could have. Russell was entitled to (and did) argue these defenses to the jury, which rejected them.

Second, even Russell appears to concede[1] that the evidence in this case was sufficient to support the verdict if the 404(b) evidence—testimony about her past drug possession and transactions—was admissible.[2] It was. Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of

---

1. *See, e.g.,* Def.Br. at 19 (" [G]iven this [404(b)] evidence comprised the majority, if not entirety, of the proof to support the conviction for conspiracy, the evidence was insufficient to prove Russell guilty. . . . ").

2. This evidence consisted of three main categories of testimony regarding: (1) searches of Rus-

sell's residence in February and March of 1994 that turned up evidence of cocaine distribution; (2) Russell's prior cocaine sales to Douglas and Starnes; and (3) Russell's prior cocaine purchases in Kansas. The government also argues that Douglas's testimony regarding prior dealings between Russell and Starnes (categories 2 and 3) is admissible as direct evidence because it

a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake of accident. . . .

Fed.R.Evid. 404(b). The government argues that the evidence of prior drug transactions was admissible, under 404(b), to show intent to enter into the drug conspiracy, knowledge of the conspiracy, motive to hide her drugs in shoes,[3] and absence of mistake or accident that the drugs were found in Starnes's bedroom. We agree. A district court's decision to admit evidence under 404(b) is reviewed for abuse of discretion. *See United States v. Rackstraw*, 7 F.3d 1476 (10th Cir.1993). An abuse of that discretion is not present here. This Court allows the introduction of prior drug transactions to prove intent, knowledge, motive, and absence of mistake in drug prosecutions. *See id.* (Ebel, J.); *United States v. Record*, 873 F.2d 1363, 1374 (10th Cir.1989); *United States v. Brown*, 770 F.2d 912, 914 (10th Cir.1985), *rev'd on other grounds*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987); *United States v. Poole*, 929 F.2d 1476, 1479–82 (10th Cir.1991). And the district court made the necessary findings under the four-part test for introduction of 404(b) evidence. *See Huddleston v. United States*, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988) ((1) proper purpose; (2) relevance; (3) 403 balance; (4) limiting instruction upon request); R.O.A. Vol. VIII, at 46, 95, 225.

■ Finally, Russell's argument that she received inadequate notice of the 404(b) evidence is not compelling. Rule 404(b) requires "the prosecution in a criminal trial [to] provide reasonable notice ... of the *general nature* of any such evidence it intends to introduce at trial." Fed.R.Evid. 404(b) (emphasis added). The government here informed Russell that it might offer "prior and subsequent conduct involving the distribution of controlled substances." R.O.A. Vol. I, at 30. While the government might have provided some additional detail of the many drug-related episodes it adduced, this statement describes the "general nature" of the evidence the government did use against Russell.[4]

## III. REFUSAL TO GRANT CONTINUANCE AFTER DISCOVERY VIOLATION

■ The next issue we confront is Russell's contention that the district court violat-

demonstrates their conspiratorial relationship. We note our disagreement with this theory. The government charged Russell only with conspiracy "on or about the 17th day of June, 1994, at Junction City, Kansas." R.O.A. Vol. III, at 1. Douglas's testimony regarding Russell's cocaine sales (category 2) involved conduct in January and February of 1994. This is too far from a specified day in June to be "on or about" that day. *Cf., e.g., United States v. Gonzalez,* 975 F.2d 1514 (11th Cir.1992) (evidence subject to Rule 404 because acts occurring 1–2 months prior not "on or about" date specified in indictment). Douglas's testimony regarding the category 3 purchases concerned events in April—a bit closer in time but still too far to be "on or about" June 17. Moreover, these latter purchases occurred in Topeka—outside the indictment's scope of "Junction City." And these other crimes were certainly not "inseparable" from the charged conspiracy. *See* Charles A. Wright & Kenneth W. Graham, 22 Federal Practice and Procedure, § 5239, at 445–49 (1978). They were different indictable offenses, and, as demonstrated above, the government was able to explain and prove its case in their absence. Although the government could have charged Russell with a broader conspiracy, it chose not to do so. The additional acts, outside the scope of the indictment, therefore fall under the category of "prior acts," subject to Rule 404.

3. The drugs in this case were stuffed in the toe of a male boot. We think this similarity is more indicative of "plan" than "motive" under 404(b), but the mislabeling is not important.

4. In the sentence that follows, the government states that "[t]he defendant's criminal record reveals one prior arrest for possession with the intent to sell cocaine on March 17, 1994." *Id.* This statement could conceivably narrow the scope of the "prior and subsequent" conduct described in the first sentence. Russell does not make this argument. Moreover, in our view, reference to the one drug arrest does not so narrow the more general description of evidence that the government might introduce that it ceases to convey the "general nature" of the evidence under 404(b). The government's general statement asserting "prior and *subsequent*" conduct described a wider scope of conduct than the prior conviction given as an example in the second sentence.

ed her Sixth Amendment right to compulsory process when it barred Russell from calling two witnesses that she failed to list in discovery. The pertinent facts are these: On June 6, 1995, a United States Magistrate Judge for the District of Kansas filed his report memorializing an "Omnibus" hearing. The report, which was fourteen pages long, contained the answers to over twenty questions and other information about the upcoming trial of Russell and Starnes. Question 1 asked whether the case is a so-called "full discovery" case where the government would disclose its entire case file, with certain exceptions. The government answered "yes." Questions 6 asked the government whether it would disclose to the defendant on a reciprocal basis the names of the government witnesses to be used in the case in chief. Question 7 asked whether the defense counsel would supply the government the names and addresses of witnesses for the defendant on a reciprocal basis. These questions, like others, could be answered "yes" or "no." Both parties answered "yes." The magistrate judge signed his report; over his signature were the words "BY THE COURT IT IS SO ORDERED." Counsel for the government and for Russell over their signatures "APPROVED" the report. On September 11, the district judge denied the government's request to modify the omnibus order by relieving it of the duty to disclose its witnesses. Addressing the government's assertion that disclosure would endanger its witnesses, the district judge ruled that the "mere possibility of intimidation is not enough to void the

agreement made by the government at the omnibus hearing." R.O.A. Vol. III, at 71.

Meanwhile, as required by the agreement, Russell had furnished the required pretrial list of witnesses indicating that one of her proposed witnesses was DeMarco Griffin. The government rested its case on the morning of the fifth day of trial; the case for the defense proceeded that afternoon. At 10:00 o'clock that morning, before the court convened, Russell had notified the prosecution that Griffin was "unavailable." At this point, for the first time, she explained her intention to call two other witnesses in his place to serve the same purpose, namely, to counter Douglas's testimony that Russell had threatened to harm him if he appeared as a witness against her. These two witnesses, although previously subpoenaed, were not on the list of witnesses furnished by Russell pursuant to her agreement at the omnibus hearing. Moreover, according to the prosecutor, Russell had assured the government that she would *not* call at least one of the two new witnesses. At 2:15 p.m. of the same day, Russell's counsel called James Givens, one of the substitute witnesses for Griffin. The Government objected that it would need time to prepare to cross-examine the substitute witnesses and that the resulting delay of the trial would be unreasonable. The district court excluded the testimony of the two substitute witnesses. We set out in the margin the entire colloquy between the court and counsel, including the court's ruling.[5]

 The Sixth Amendment states that in criminal prosecutions the accused has the

5. "MS. TRUBEY: The defense calls James Givens.

MR. LUEDKE: Judge, I think we're going to have to talk about this witness.

THE COURT: All right, let's do that. Would you approach the bench and we'll—

(THEREUPON, the following proceedings were had at the bench out of the hearing of the jury panel).

MR. LUEDKE: Judge, the Government wasn't notified this witness was going to testify, it wasn't on any witness list that the defendant provided. We just found out about it this morning when the defendant said they were going to have him testify. We'd object to him on any business order. We'd had a mutual disclosure of witnesses here, Judge, and she didn't provide that.

MS. TRUBEY: Your Honor, as I explained to Mr. Luedke this morning, Mr. Givens is a substitute witness for DeMarco Griffin. He's going to testify to the same thing that Mr. Givens would have. I just can't get Mr. Givens here this afternoon. So the testimony certainly isn't going to be any surprise to the Government.

THE COURT: Now, the other witness who was—who you notified them about, what was his name?

MS. TRUBEY: DeMarco Griffin.

THE COURT: DeMarco?

MS. TRUBEY: DeMarco, yes. It's an unusual name.

THE COURT: You frightened me there.

MR. LUEDKE: Judge, we haven't had the opportunity to investigate the background of this witness and collect certified copies of his crimi-

right "to have compulsory process for obtaining witnesses in his favor." U.S. CONST. amend. VI. Although the amendment speaks literally of only "compulsory process," this provision has been interpreted more broadly: it guarantees the right to present defense witnesses whether subpoenaed or not.

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Taylor v. Illinois,* 484 U.S. 400, 409, 108 S.Ct. 646, 653, 98 L.Ed.2d 798 (1988) (quoting *Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967)). The right to present defense witnesses, however, is not absolute. The resolution of this issue, as Russell acknowledges, turns on whether the district court abused its discretion. Excluding witnesses for failure to comply with discovery orders, if not an abuse of discretion, does not violate a defendant's Sixth Amendment right to compulsory process. *See Taylor v. Illinois,* 484 U.S. 400, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988).

> nal convictions with which to impeach him. Who's to say this is a substitute witness and will testify to the same thing, that doesn't make any difference, Judge. At disclosure gives some opportunity to do some investigation on our own to prepare for cross-examination and we have not been able to do that.
>
> MS. TRUBEY: Your Honor, we were—when the Government was presenting its case in chief we were handed some new 404(b) evidence on the morning and that was allowed. This is not as gregarious [sic] as that was.
>
> THE COURT: Well, I don't know about that, but—
>
> MR. LUEDKE: Judge, we're going to be totally unprepared to cross-examine this witness. He has criminal convictions, I know he does, but we don't have the evidence necessary to impeach him with it.
>
> MS. TRUBEY: I told Mr. Luedke about this before we started court this morning and it's now—
>
> MR. LUEDKE: That was 10 o'clock this morning, Judge.
>
> MS. TRUBEY: 2:15.
>
> MR. LUEDKE: We recessed at 11:30, but that's not sufficient time to get—go get certified copies. In fact, it's impossible to get certified copies from the—
>
> MS. TRUBEY: You don't need certified copies to cross-examine somebody.
>
> THE COURT: Well, I think as far as witnesses are concerned I've really been pretty lenient, but I just think I'm going to have to make a rule that unless they're—unless people notify them we just can't do that. I think that's about the only thing I can do and I'm going to have to do. I run into these situations all the time and I believe on something like this there's no way I can—the only way I can allow this person to testify would be if they would testify tomorrow and give them some time to check up on their—I don't know how long it will take you to check up on this person, but—
>
> MR. LUEDKE: I suppose that would do it. However, Judge, it's going to unreasonably extend the length of this trial.
>
> THE COURT: I understand that. But I'm just going to say as of right now I'm not going to allow this person to testify as a substitute for somebody else.
>
> MS. TRUBEY: Will you allow him to testify tomorrow?
>
> THE COURT: Well, if you can get the information on him.
>
> MR. LUEDKE: Judge, I might also add that Georgia Jackson is in the same position here. Georgia Jackson, another witness that they intend to call, is in the same position. We weren't notified that she was going to be called. In fact, we were told just the opposite, that she wasn't going to be called.
>
> MS. TRUBEY: It's the same situation. I can't get DeMarco Griffin here.
>
> THE COURT: You're calling two witnesses to replace the one?
>
> MS. TRUBEY: Right.
>
> THE COURT: I believe I'm just going to tell you I'm not going to allow you to do it at this time.
>
> MS. TRUBEY: Okay. Well, we'll just plan on calling both of them tomorrow then.
>
> MR. LUEDKE: Judge, I guess we'd object to that. Obviously, Judge, it's not hard to notify the other side of your witnesses. I mean, this thing has been going on for a long time, Judge. If we had tried to do the same thing, why, Ms. Trubey would be making the same arguments we're making, Judge, and rightfully so. So I'm just going to object to any testimony from these witnesses.
>
> THE COURT: I thing I'm just going to say these witnesses cannot testify because the Government was not notified.
>
> MS. TRUBEY: All right."

R.O.A. Vol. XI, at 727–732.

■ We affirm the judgment of the District court excluding the testimony of the two substitute witnesses. We observe first that, although both litigants treat this case as though Federal Rule of Criminal Procedure 16(d)(2) controls, it does not. *See* Fed. R.Crim.P. 16(d)(2). Rule 16 does not require pretrial disclosure of nonexpert witnesses, and subsection (d)(2) does not authorize sanctions for violations of discovery orders unless the discovery in question is governed by that Rule. *See id.* ("If ... a party has failed to comply with *this rule,* the court may order [appropriate remedies].") (emphasis added). In noncapital cases, moreover, there is no constitutional right to the pretrial disclosure of witnesses. *See Weatherford v. Bursey,* 429 U.S. 545, 559, 97 S.Ct. 837, 845–46, 51 L.Ed.2d 30 (1977); *United States v. Metropolitan Enterprises,* 728 F.2d 444, 451 (10th Cir.1984). The record makes clear that the witness discovery obligation was not based on Rule 16. Nor was it based on 28 U.S.C. 2071(a) or Fed.R.Crim.P. 57(a), both of which authorize district courts to promulgate local rules consistent with federal statutes and the Federal Rules of Criminal Procedure.

■ This obligation rests on Russell's reciprocal agreement with the government, memorialized by the omnibus order, to disclose witnesses prior to trial. Russell does not deny her agreement or challenge the validity of the omnibus order. Nor does she deny that calling substitute witnesses was contrary to her witness discovery obligation. There is no constitutional barrier to trial courts requiring the mutual pretrial disclosure of witnesses. *See Taylor,* 484 U.S. at 410–13, 108 S.Ct. at 653–55. And we have long recognized the power of district courts to sanction violations of reciprocal discovery agreements. *See, e.g., United States v. Jones,* 730 F.2d 593, 596 (10th Cir.1984) (appropriate sanction for violating "Omnibus Hearing Report" by failing to disclose witnesses on time is "within the discretion of the trial court."); *United States v. Miller,* 499 F.2d 736, 744 (10th Cir.1974) (government's nondisclosure "constituted noncompliance with the pretrial discovery order and Omnibus Hearing Report.

[Nevertheless,] the decision to reject or accept the documents was properly within the trial court's discretion.") (citing *United States v. Dowdy,* 455 F.2d 1253 (10th Cir. 1972); *United States v. Leaphart,* 513 F.2d 747, 749 (10th Cir.1975) ("[W]e are not to be understood as saying that the failure to observe the terms of the Omnibus Hearing would not under other circumstances furnish a ground for barring the evidence not reported."); *cf. United States v. Jackson,* 508 F.2d 1001, 1006–08 (7th Cir.1975) (upholding district court's dismissal of indictment when the government failed to comply with mutual witness disclosure mandated by the trial court).

Although Rule 16 does not control this case, it provides a helpful point of reference for our analysis by describing the district court's authority to remedy discovery infractions in analogous circumstances. Rule 16(d)(2) of the Federal Rules of Criminal Procedure invests the district court with broad discretion in coping with discovery order violations:

> If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or *prohibit the party from introducing evidence not disclosed,* or it may enter such order as it deems just under the circumstances. The court may specify the time, place and manner of making the discovery and inspection and may prescribe such terms and conditions as are just.

Fed.R.Crim.P. 16(d)(2) (emphasis added). The rule thus expressly provides for excluding evidence as a remedy for discovery violations in appropriate circumstances.

This Court interpreted the scope of Rule 16(d)(2) in *United States v. Wicker,* 848 F.2d 1059, 1061 (10th Cir.1988), on which Russell relies heavily. In *Wicker,* the court affirmed the district court's decision to bar the government, in a criminal trial, from introducing a report and testimony from the expert who prepared the report. It evaluated the three

factors relied upon by the district court: (1) the reason for the delay; (2) whether the delay prejudiced the other party; and (3) the feasibility of curing the prejudice with a continuance. First, the court reasoned that the report was unjustifiably late, even though it concluded that the government's tardiness was probably the result of negligence rather than bad faith. *Id.* The court next determined that the defense would be prejudiced without a continuance to analyze the report. *Id.* Finally, turning to consider whether a continuance was the proper remedy, "[t]he district court observed that the jury had already been selected and that trial was ready to begin. Moreover, the district court noted that scheduling constraints imposed by other cases on its docket would not allow a continuance without prejudicing the parties in other criminal matters." *Id.* Thus, the court affirmed the refusal to grant the continuance.

Significantly, in the course of its opinion, *id.* at 1061, the court stated that the three factors merely guide the district court and do not dictate the bounds of the court's discretion.[6] Quoting *Taylor,* *Wicker* explained that "it is neither necessary nor appropriate for us to attempt to draft a comprehensive set of standards to guide the exercise of discretion in every possible case." *Id.* (quoting *Taylor,* 484 U.S. at 414, 108 S.Ct. at 656). Each factor, then, need not be evaluated in isolation. *Id.* at 416, 108 S.Ct. at 656–57. Even in the absence of prejudice, integrity and scheduling considerations alone may justify suppression of otherwise admissible evidence offered by the delinquent party. *Taylor* made this clear when it held that willful bad faith alone justified suppression even if the prosecution suffered no prejudice. The Court was concerned with maintaining "the integrity of the judicial process itself." *Id.* at 416, 108 S.Ct. at 657.

*Wicker* was a Rule 16 case. This one is not. But *Wicker* is a satisfactory precedent to deal with violations of orders requiring pretrial disclosure of witnesses. Russell concedes that she did not properly inform the government of her substitute witness, but contends that her actions were compelled by her inability to "get Mr. Griffin here this afternoon." R.O.A. Vol. XI, at 727–28. The main thrust of this argument is that, given her supposed lack of bad faith, the district court overreacted by barring the witnesses completely, in contravention of *Wicker's* admonition that the court "must impose the least severe sanction that will accomplish prompt and full compliance with the court's discovery order." *Id.* at 1060 (internal quotations omitted). Rather, she says, the district court should have granted a continuance.

The government responds that Russell did not establish lack of bad faith and hence failed to pass the first *Wicker* factor. Although some reason may have existed that Russell could not haul Griffin in under the court's subpoena power, she never bothered to explain why he was "unavailable." The government also rebuts the feasibility of a continuance, pointing out that the trial had already "extended nearly 5 days."

The district court's decision, consistent with *Wicker,* was not an abuse of its discretion. First, as in that case, defense counsel was at least negligent in the discovery violation. Russell's counsel made no apparent effort to enforce the subpoena against Griffin—a strange omission for a supposedly important witness. Instead, Russell simply brought two unlisted witnesses, Givens and Jackson, to court that day. Since Russell was the violating party seeking to avoid the sanction, the burden was on her to explain the failure to produce Griffin. But she offered only the assertion that she could not

---

**6.** *United States v. Mavrokordatos,* 933 F.2d 843, 847 (10th Cir.1991), stated that "[i]n *Wicker,* we set out the following factors which the trial court *must follow* in determining the appropriate sanction for noncompliance with a discovery order." (emphasis added). However, *Wicker* itself states explicitly that its factors are neither exhaustive nor dispositive. 848 F.2d at 1061 (quoting *Taylor* 484 U.S. at 414, 108 S.Ct. at 655). We doubt that *Mavrokordatos* intended to contradict *Wicker.* Rather, we understand that opinion to mean that the *Wicker* factors cannot be excluded in the considerations governing the abuse of discretion.

"get Mr. Griffin here this afternoon." R.O.A. Vol. XI, at 727–28. It also seems likely that these additional witnesses could have been listed in the pretrial disclosure of witnesses.[7] But they were not. At a minimum, Russell's counsel could have given the government more notice than the morning, on the fifth day of the trial, of the same day she proposed to call the new witnesses. Russell moved the court to subpoena both substitute witnesses on September 5—a week before the trial had even begun—and it must have taken some time and attention to ready Givens and Jackson to testify that afternoon. Prompt notification, therefore, could have avoided the need for a continuance. Russell's actions constituted a wholly unsatisfactory compliance with the first *Wicker* factor.

With regard to factor two, there is no doubt that the prosecution would have been prejudiced, like the defendant in *Wicker*, had Givens and Jackson been permitted to testify without a continuance. The trial court recognized that the government would need time to research the background of the substitute witnesses in order to cross-examine them in an effective manner.[8] The inability to do so would have put a substantial burden on the government's case.

Finally, even in the absence of bad faith, the facts do not indicate that the judge abused his discretion in applying the third *Wicker* factor by refusing a continuance. As in *Wicker*, the trial had begun; indeed, it was in its fifth day. The judge did consider a continuance, but when he learned that there were two witnesses that the government would have to investigate—not just one—he apparently decided that the court could not afford the time lost. *Wicker*'s admonition that the trial court must impose "the least severe sanction that will accomplish ...

prompt and full compliance with the court's discovery orders," *id.* at 1060, does not mean that a continuance is necessary just because it will cure the prejudice. Rather, as *Wicker* stated, "[o]n occasion the district court may need to suppress evidence that did not comply with discovery orders to maintain the integrity and schedule of the court even though the defendant may not be prejudiced." *Id.* at 1061. A remedy that does not maintain that integrity and schedule does not "accomplish ... prompt and full compliance with the court's discovery orders." And if bad faith were involved, exclusion would have been proper regardless of prejudice or the feasibility of a continuance. See *Taylor*, 484 U.S. at 413, 108 S.Ct. at 655 (excluding defense witness in a case suggesting bad faith and willfulness did not offend the Sixth Amendment even when less drastic sanctions are available).

Russell asserts that the trial judge erred by not discussing the *Wicker* case and its three factors for guiding the court's discretion. But Russell's counsel did not bring *Wicker* to the attention of Judge Rogers, the trial judge, during the critical colloquy set out in note 5, *supra*. Nor did Russell rely on *Wicker* or complain at all about the exclusion of the two substitute witnesses in her posttrial motions. Furthermore, Judge Rogers was aware that Rule 16 does not control this case, for he cited *United States v. Napue*, 834 F.2d 1311 (7th Cir.1987), in his opinion denying the prosecution's motion to relieve it of the obligation to disclose its witnesses. *Napue* held that Rule 16 does not deal with general witness discovery. 834 F.2d at 1317.

The Supreme Court has held that "[t]rial judges are presumed to know the law and to apply it in making their decisions." *Walton v. Arizona*, 497 U.S. 639, 652, 110 S.Ct. 3047,

---

7. As the Court observed in *Taylor*:
 [T]he Compulsory Process Clause cannot be invoked without the prior planning and affirmative conduct of the defendant. Lawyers are accustomed to deadlines. Routine preparation involves location and interrogation of potential witnesses and the serving of subpoenas on those whose testimony will be offered at trial. The burden of identifying them in advance of

trial adds little to these routine demands of trial preparation.
484 U.S. at 415–16, 108 S.Ct. at 656.

8. For this reason, Russell's alternative argument—that no continuance was necessary because the government knew the substance of the substitute witnesses' testimony—is meritless.

3057, 111 L.Ed.2d 511 (1990). Judge Rogers has been a United States District Judge since 1975 and has tried countless criminal cases. As he said in the course of his ruling on the proposed two substitute witnesses, "I run into these situations all the time." We presume that the judge was familiar with *Wicker* even if counsel were not at the time. And he was certainly as competent as we are to borrow the *Wicker* standards if he thought they would guide the exercise of his discretion in this case. We hold that he did not abuse his discretion in ruling as he did.

## IV. CONSPIRACY INSTRUCTION

■ Russell also asserts that the instruction given in her case did not list all four elements necessary to her conspiracy conviction. She cites the following portion of the instruction:

What the evidence [in] this case must show beyond a reasonable doubt is:

(1) That two or more persons in some way or manner, positively or tacitly, came to a mutual understanding to try to accomplish a common and unlawful plan, as charged in the Indictment; and

(2) That the defendants willfully became members of such conspiracy.

Instr. # 9, R.O.A. Vol. II, at 99–100. According to Tenth Circuit law, Russell continues, the prosecution must establish *four* elements to prove a conspiracy:

■ that two or more persons agreed to violate the law, [2] that the defendant knew at least the essential objective of the conspiracy, ... [3] that the defendant knowingly and voluntarily became a part of it, and [4] that the alleged coconspirators were interdependent.

*United States v. Evans*, 970 F.2d 663, 668 (10th Cir.1992) (internal quotations omitted), *cert. denied*, 507 U.S. 922, 113 S.Ct. 1288, 122 L.Ed.2d 680 (1993). Therefore, the district court omitted two of the four elements, according to Russell, and this constitutes struc-

tural constitutional error requiring reversal. *See United States v. Gaudin*, —— U.S. ——, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995).

This contention does not hold up. We review the adequacy of these jury instructions *de novo*, examining the instructions as a whole. *See United States v. Migliaccio*, 34 F.3d 1517, 1523 (10th Cir.1994). An examination of the actual jury instruction reveals that it did charge the jury on the necessary four elements. Elements [1], [2], and [4] are all contained in the first prong of the actual instruction. Element [3] is stated in prong two of the actual instruction. That the district court organized the elements into two points (instead of four) is not material to whether the instruction charged the jury with finding, beyond a reasonable doubt, all the necessary elements. Indeed, even after the government chided Russell in its brief for this omission, she never pointed out in her reply *which* two elements were missing. At oral argument, Russell finally made clear that she was objecting to the lack of the "interdependence" prong on the theory that it was necessary to distinguish a true conspiracy from a buyer-seller arrangement. But the instruction adequately stated this Court's requirement of "interdependence." Prong one of the instruction requires the jury to find, beyond a reasonable doubt, that "two or more persons in some way or manner, positively or tacitly, came to a mutual understanding to try to accomplish a common and unlawful plan, *as charged in the Indictment."* (emphasis added). The indictment, in turn, makes clear that Russell was charged with conspiring with Starnes "to possess with intent to distribute, approximately 18.3 grams of ... cocaine base." R.O.A. Vol. III., at 1. Thus, the charge makes clear that Russell is not being prosecuted for being a mere buyer or seller of cocaine. Indeed, Russell's defense never was—nor could it plausibly have been—that she was merely buying or selling $11,000 worth of cocaine for personal consumption.

Furthermore, the entire Instruction # 9 contains an additional five paragraphs of explanation beyond that Russell acknowledges.

*See* Instr. # 9, R.O.A. Vol. II, at 99–100. For instance, the full instruction admonishes the jury:

> Of course, mere presence at the scene of an alleged transaction or event, or mere similarity of conduct among various persons and the fact that they may have associated with each other and may have assembled together and discussed common aims or interests, does not necessarily establish proof of the existence of a conspiracy. Also, a person who has no knowledge of a conspiracy, but who happens to act in a way which advances some object or purpose of the conspiracy, does not thereby become a conspirator.

*Id.* The instruction, read in its entirety, adequately stated all the elements of conspiracy.

Finally, the district court was correct to reject the instruction proposed by Russell. It did not accurately state the law. The proposed charge claimed, among other things, that "interdependence" required "each conspirator's presence and acts [to be] necessary to make the conspiracy succeed." Def.Prop.Instr. # 13, R.O.A. Vol. III, at 74. Such a "but for" indispensability requirement has never been part of the law of conspiracy. On Russell's theory, a getaway driver in a planned bank robbery would not be guilty of conspiracy if another member of the team could have sped the group from the scene of the crime.

## V. CLOSING ARGUMENT

■ Finally, we address Russell's argument that the district court erred in refusing to grant a new trial for allegedly improper comments the government made in its closing argument. In support of this argument, Russell points to two statements in the government's closing argument that she asserts amounted to prosecutorial misconduct: (1) "Did you ever get the feeling they were making it up as they went along?"; and (2) "Their job—Mr. Jackson talked about his job, their job is not to find the truth here. Their job is to get their clients off."

■ Because her trial counsel did not make a contemporaneous objection, this panel reviews the comments for plain error. *See United State v. Lonedog,* 929 F.2d 568, 570 (10th Cir.), *cert. denied,* 502 U.S. 854, 112 S.Ct. 164, 116 L.Ed.2d 129 (1991). To require reversal under the plain error doctrine, the error must be sufficiently "egregious" so to result in a "miscarriage of justice." *United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985). In addition, the allegedly improper comments must be viewed against the entire record. *See id.* at 16, 105 S.Ct. at 1047.

Plain error is not present here. The government's first comment regarding "making it up as they went along," when taken in context, sought to undermine the credibility of the defense's story and witnesses. This is a necessary part of the government's responsibilities in any criminal trial in which the defendant puts on a defense. The government admits that comment number two—about defense counsel's job being to "get their clients off"—was "ill advised." It is not such a distortion of defense counsels' role, however, as to amount to plain error. Unlike in the two primary cases on which Starnes relies, the prosecution did not claim that defense counsel was involved in deceit. *See United States v. Rios,* 611 F.2d 1335 (10th Cir.1979); *United States v. Linn,* 31 F.3d 987 (10th Cir.1994). *Rios* found reversible error, after objection,[9] when the prosecutor insinuated during closing argument that defense counsel had suborned perjured testimony. 611 F.2d at 1342. This is a much more extreme allegation than the one in this case: that defense counsel was changing its defense theory as it went along. And *Linn,* while expressing distaste for the prosecutorial remarks, found no plain error even when

---

9. The opinion is ambiguous regarding whether the error was plain. Defense counsel objected, but not until after the end of the rebuttal, and did not specify the particular remarks. 611 F.2d at 1342 & n. 9.

those remarks went so far as to claim that defense counsels' job was to "mislead" the jury. 31 F.3d at 993. The comments in this case, viewed against the entire record, were not so "egregious" as to amount to a "miscarriage of justice" nullifying the results of this trial.

## V. CONCLUSION

We conclude that (1) the evidence was sufficient to support the conspiracy conviction; (2) the district court did not abuse its discretion in denying a continuance in light of Russell's discovery violation; (3) the conspiracy charge adequately stated the law; and (4) the prosecution's closing remarks did not amount to misconduct requiring a new trial. The judgment is affirmed.