BRISCOE, Chief Judge,
dissenting.
I dissent. In my view, nothing in the record supports the district court’s decision to impose the drastic sanction of excluding from trial what is a highly incriminatory and potentially trial-altering piece of evidence. I therefore conclude that the district court abused its discretion and would remand with directions to admit the evidence at trial.
I

Standard of review

“District courts have broad discretion to sanction a party who violates discovery orders” or other pretrial scheduling orders. United States v. Golyansky, 291 F.3d 1245, 1249 (10th Cir.2002). “In the absence of a finding of bad faith, the court should impose the least severe sanction that will accomplish the prompt and full compliance with the discovery order.” Id. “The preferred sanction is a continuance,” and “[i]t would be a rare case where, absent bad faith, a district court should ex- *682 elude evidence rather than continue the proceedings.” Id.
“[W]e review a court’s decision to impose sanctions and its choice of sanctions for abuse of discretion.” United States v. Gonzales, 164 F.3d 1285, 1291 (10th Cir.1999). Generally speaking, “[a] district court abuses its discretion only if its ruling is arbitrary, capricious, whimsical or manifestly unreasonable or when we are convinced that the district court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances.” United States v. Garcia, 635 F.3d 472, 476 (10th Cir.2011) (internal quotation marks omitted).

Wicker and its guiding factors

In United States v. Wicker, 848 F.2d 1059 (10th Cir.1988), we considered an interlocutory appeal filed by the government challenging a district court order excluding evidence from a criminal trial as a sanction for the government’s production of a laboratory and scientific report to the defendants just days prior to the start of trial. In reviewing the order of exclusion at issue in Wicker, we began by noting that “Rule 16(d)(2) of the Federal Rules of Criminal Procedure gives [a] district court broad discretion in imposing sanctions on a party who fails to comply with a discovery order.” Id. at 1060. We cautioned, however, that “[djespite this broad grant of power, [a] district court’s exercise of discretion should be guided by several factors; and if a sanction is imposed, it should be the least severe sanction that will accomplish ... prompt and full compliance with the court’s discovery orders.” Id. (ellipsis in original; internal quotation marks omitted).
We proceeded to outline three factors that a district court should consider “[v(]hen the government fails to comply with a discovery order.” Id. at 1061. First, a district court should consider “the reasons the government delayed producing the requested materials, including whether or not the government acted in bad faith when it failed to comply with the discovery order.” . Id. Second, a district court must consider “the extent of prejudice to the defendant as a result of the government’s delay.” Id. Third, a district court must consider “the feasibility of curing the prejudice with a continuance.” Id. These three factors, we emphasized, “are not intended to dictate the bounds of [a district] court’s discretion,” but rather “should merely guide the district court in its consideration of sanctions.” Id. For example, we noted, “[o]n occasion [a] district court may need to suppress evidence that did not comply with discovery orders to maintain the integrity and schedule of the court even though the defendant may not be prejudiced.” Id.
Since Wicker, we have applied its guiding factors in similar contexts, such as where the government violates a district court’s scheduling orders. See, e.g., United States v. Russell, 109 F.3d 1503, 1511 (10th Cir.1997) (holding that “Wicker is a satisfactory precedent to deal with violations of orders requiring pretrial disclosure of witnesses.”). And, indeed, the pri- or panel in this case directed the district court on remand to consider and apply the factors outlined in Wicker to determine what, if any, sanction to impose on the government for its belated disclosure of its intention to introduce at trial the 911 recording made by the victim shortly prior to her death.
II

The district court’s analysis of the first Wicker factor

In its order on remand, the district court began by analyzing the first Wicker *683 factor, i.e., the reasons for the government’s untimely designation of the 911 recording as a trial exhibit. As part of its analysis, the district court made detailed findings of fact regarding the investigation of the murder at issue in this case, including, in particular, the events leading to the government’s discovery, and subsequent disclosure to the defense and the district court, of the victim’s cell phone and the recording of the 911 call that the victim made shortly prior to her death. Unfortunately, the district court clearly erred, and was unreasonably critical of the case agent, Federal Bureau of Investigation (FBI) Special Agent Ben Bourgeois, in at least two respects.
A
To begin with, the district court held Agent Bourgeois responsible, and effectively characterized him as having acted negligently, for failing to determine, shortly prior to the scheduled trial date in August 2013, that the victim made a 911 call from Yepa’s house. In particular, the district court stated as follows:
By December 29, 2011, the [Jimenez Pueblo Police Department (JPPD) ] had associated the Becenti homicide with three 911 calls made to [the Sandoval County Regional Emergency Communications Center (SCRECC) ] on the evening of December 28, 2011. On December 29, 2011, the JPPD provided Agent Bourgeois with printed copies of the Computer Assisted Dispatch [ (CAD) ] ■reports of the three calls. The first CAD report concerned a 911 call relating to Ms. Becenti’s boyfriend, Tom Col-lateta. The second CAD report was the report of the 9:23 p.m. 911 call. The third CAD report was the report of tribal official Clint Sando’s 911 call reporting an “unresponsive female.” Agent Bourgeois did not consider the information in the CAD reports to be a priority. It did not occur to him to ask why the JPPD had associated these three CAD reports with the Becenti homicide. The CAD reports were filed and thereafter apparently forgotten by Agent Bourgeois.
App., Vol. II at 534-35 (internal citations omitted).
A close review of that second CAD report, however, reveals why Agent Bourgeois chose not to investigate it, at least initially. The upper portion of the report describes the “Call Type” as “087 Welfare Check.” Id. at 391. The upper portion further lists the caller’s location as the intersection of Highway 550 and Highway 4 in San Ysidro, New Mexico. Although there is a space for the caller’s name and address, those items are blank. Only the caller’s phone number is listed. The middle portion of the report, entitled “NARRATIVE,” provides the dispatcher’s description of the call, her response to it, and the responding police officer’s description of what he observed in attempting to physically trace the caller at the described location:
voip 911 calll [sic] from a very intoxicated beligerent [sic] female
voip only comes in phase one showing area of 550 and hwy 4
female would not give me her name or any info
rings then hangs up
located another possible tx 720 494 5800 attempting t25
no answer at all on this number, no option to leave a
message
attempting t25 w/rp again
voicemail comes back to a female / / left message
*684 244; it appears that the family dollar is closed right now. the intersection at hwy4/550, i don’t see anybody.
244; re-check of the gas station, there is only 2 employees there now. possibly first name of ananton?
Id. Finally, the lower portion of the report lists the “Unit Status History Information.” Id. This lists the name of the dispatched officer, the time he was dispatched to perform the welfare check, the time he arrived on the scene, and the time he completed the check and returned to “Available” status. Id.
Simply put, nothing in this second CAD report would have remotely alerted a reasonable officer to the fact that the call was made by the victim, from Yepa’s house, during the midst of the sexual assault that led to her death.[1] Nor does the report indicate that a male’s voice can be heard in the background. As a result, it is entirely understandable why Agent Bourgeois chose, in the days and months immediately following the murder, to focus his investigative efforts elsewhere.
B
The district court was also critical of Agent Bourgeois for not directly asking the JPPD: “Did the officers recover the [victim’s] cellphone?” Id. at 543. In addition, the district court found that “[t]he JPPD did not produce the cellphone prior to July 31, 2013 because ... Agent [Bourgeois] never requested it.” Id.
These findings, however, ignore the undisputed testimony of Agent Bourgeois and Ray Soto, the JPPD officer in charge of the JPPD’s evidence locker at the time of these events. Agent Bourgeois testified that, based upon memorandums of understanding between the FBI and the Bureau of Indian Affairs, all tribal law enforcement agencies, including the JPPD, were required to submit to the FBI all relevant evidence and documents pertaining to any case in which the FBI was involved. Officer Soto affirmed Bourgeois’ testimony on this point. Specifically, Soto testified that when the FBI assumes responsibility for a case and asks for evidence, the tribal law enforcement agency is supposed to turn over all evidence in the case. App., Vol. V at 970. Soto further testified that this is a standing request that is understood among all law enforcement personnel. Id. Thus, contrary to the district court’s findings, it was the JPPD that was negligent in failing to turn over the victim’s cell phone to Agent Bourgeois at the beginning of his investigation, in response to his request to Chief Toya for all items related to the homicide.[2] And, again contrary to the district court’s findings, it was entirely reasonable for Agent Bourgeois to assume, based upon the fact that the JPPD did not turn over the victim’s cell phone to him in response to his request for all of the evi- *685 denee, that the cell phone had not been located.
C
Setting aside the district court’s clearly erroneous factual findings, it is apparent that the government’s delay in designating the 911 recording as a trial exhibit was, in significant measure, the result of the JPPD’s failure in responding adequately to Agent Bourgeois’ clear and unequivocal request for all of the case materials and evidence at the outset of his investigation. More specifically, it is apparent that the JPPD’s evidence officer acted negligently in failing to turn the victim’s cell phone over to Agent Bourgeois.
The worst that can be said of Agent Bourgeois’s performance is that, between mid-June and late July of 2013, he failed, in response to a request from the lead prosecutor, to determine if the phone number listed on the second CAD report belonged to the victim. Agent Bourgeois was also, debatably, slow in examining the contents of the victim’s cell phone after it was obtained from the JPPD on July 31, 2013. Considered together, these actions at most caused a two-month delay in the government’s decision to notify the defense team of its intention to use the 911 recording as a trial exhibit.[3]
Most importantly, as the district court itself ultimately conceded (even despite its clearly erroneous factual findings), there is no evidence whatsoever that the government acted in bad faith.
Ill

The second and third Wicker factors

In assessing the second and third Wicker factors (the extent of prejudice to the defendant caused by the delay, and the feasibility of curing the prejudice with a continuance), the district court found that the government’s “delay in designating the 911 recording seriously disrupted defense preparations for trial, which was to begin on August 14, 2013.” App., Vol. II at 545-46. The district court in turn found that “[a] continuance of four to eight weeks would have cured the prejudice to [Yepaj’s ability to defend arising from the late disclosure of evidence connecting the 911 call to the homicide.” Id. at 548. Absent other exceptional circumstances, these findings should have compelled a determination that a continuance was the proper remedy for the government’s delay in providing notice to Yepa.
But the district court purported to find another type of prejudice. Noting that Yepa “had been continuously confined without bail since December 29, 2011,” id., the district court concluded that a continuance of the August 14, 2013 trial date “would have unfairly required [Yepa], who was being held without bail, to suffer an additional four to eight weeks of pretrial incarceration.” Id. at 549-50.
The problem, however, is that this is not the type of “prejudice” contemplated by Wicker and its progeny. Wicker, as previously noted, directs us to focus on the prejudice caused to the defendant by the government’s delay, and we have defined such prejudice in terms of “the defendant’s ability to prepare or present its case.” Golyansky, 291 F.3d at 1250. Wicker, in turn, asks us to determine if any such resulting prejudice can be cured by a continuance. The district court in this case turned the Wicker analysis on its head by asking whether the continuance itself would prejudice the defendant. In other words, the district court performed a “double”' prejudice analysis: after concluding *686 that the prejudice to Yepa caused by the government’s delay in disclosure could be cured by a four to eight-week continuance, it in turn assessed whether such a continuance would prejudice Yepa. That approach finds no support in Wicker and, in my view, amounts to an abuse of discretion. See Koon v. United States, 518 U.S. 81, 100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) (holding that “[a] district court by definition abuses its discretion when it makes an error of law.”).
Even assuming, for purposes of argument, that this type of prejudice can be considered under Wicker, the district court did not provide any specific explanation for why, given the particular circumstances of Yepa’s case, the additional period of incarceration would have been “unfair” or prejudicial to Yepa. Although the district court’s order excluding the 911 recording referred in passing to the constitutional right to a speedy trial and its intended purpose of preventing undue and oppressive pretrial incarceration, the district court did not conclude, nor did Yepa even assert, that a four to eight-week continuance would result in a violation of his speedy trial rights. And, after examining the record on appeal, I find nothing therein that would compel a conclusion that Yepa would have been unduly prejudiced by an additional four to eight-week period of pretrial confinement. The fact of Yepa’s pretrial detention stems from the district court’s repeated findings that Yepa represents a danger to the community. As a result, the district court has consistently refused, including during the pen-dency of the appeals in this matter, to release Yepa on bond or to a halfway house.[4] As for the length of Yepa’s pretrial detention, Yepa himself bears significant responsibility. Just three months after his arrest, Yepa moved successfully to vacate and continue the original trial date of April 4, 2012, that was set by the district court. And shortly thereafter, on April 11, 2012, Yepa moved successfully to have the case declared complex.
I also agree with the government that the district court effectively, and improperly, “carved out an exception to the preference for a continuance for cases where the defendant is detained pending trial.” Aplt. Br. at 23. More specifically, because “[t]he district court did not point to any facts specific to this case that would make the additional time in pretrial custody especially onerous or prejudicial,” its “analysis essentially, would foreclose a continuance in any case in which the defendant is detained pending trial, which is hardly a rare occurrence.” Id. Surely that cannot be the result anticipated by Wicker.
In sum, the district court’s conclusion that Yepa would suffer “unfair prejudice” from an additional four to eight weeks of pretrial incarceration is simply not supported by any evidence in the record or any Supreme Court or circuit precedent.
IV

The “other concerns” cited by the district court

In addition to the Wicker factors, the district court, in choosing to exclude the *687 911 recording, also gave consideration to what it characterized as “other concerns.”
A
To begin with, the district court rejected the government’s assertion that exclusion of the 911 recording would preclude a just adjudication of the case. In support, the district court asserted that the 911 recording “does not ‘make or break’ the United States’ case.” App., Vol. II at 550. “Even without the 911 call,” the district court stated, “the United States has a strong case, which includes the eyewitness testimony of Rodney Adams, the bloody condition of [Yepa’s] person and home, and fingerprint, serological and DNA evidence.” Id. (internal footnote omitted). Thus, the district court concluded, “[exclusion of the 911 recording w[ould] not preclude a just adjudication of this case.” Id. (internal quotation marks omitted).
This conclusion, however, it at odds with the district court’s own descriptions of the recording:
The 911 recording is very disturbing and required the defense to devise a strategy for countering the emotional impact of the recording on the jury. Although the Court does not find the substance of the recording necessarily inconsistent with Defendant’s theory that Rodney Adams murdered the victim [while Yepa was purportedly passed out and unconscious due to alcohol intoxication], the recording, if properly authenticated, would corroborate Rodney Adams’ testimony that Defendant sexually assaulted the victim.
App., Vol. II at 546 (footnotes omitted).
[The recording] corroborates Adams’ statement that Defendant sexually assaulted the victim, requiring the defense to make the difficult argument that “Defendant may have raped the victim, but he did not commit the rape that resulted in her death.”
Id. at 550.
In short, the 911 recording is not simply an additional piece of evidence that can be excluded without significant impact on this case. Rather, the 911 recording is, for lack of a better description, a “game-changing” piece of evidence that quite clearly impacts the defense that can be mounted by Yepa. According to what we know at this point, only three people were present in Yepa’s house at the time of the assault that led to the victim’s death: the victim, Yepa, and Rodney Adams. The two survivors, Yepa and Adams, each purportedly claim that the other was responsible for the victim’s death. Without question, admitting the 911 recording at trial will assist the jury in resolving these claims. In contrast, excluding the 911 recording amounts to a severe sanction and threatens to undermine the just adjudication of the charges that are pending against Yepa.
B
The other “concern” discussed by the district court was the impact of a four to eight-week continuance on the summoned jurors, the district court, and the visiting judge who had planned to preside over the trial. With respect to these impacts, the district court stated, in full, as follows:
As of Sunday, August 11, 2013, the jury had not yet been impanelled. However, the jurors had been summoned and would have made arrangements affecting work, childcare and transportation, among other matters. As the Court knew, continuing the trial would render for naught these personal sacrifices by the jury panel. As the Court observed, in its Order of August 11, 2013, the Court and its staff had devoted many hours in preparing the case for *688 trial beginning August 14, 2013, diverting court resources from other time-sensitive matters. A continuance would have squandered the August 14, 2013 trial setting, [the visiting judge’s] preparations for trying the case beginning on August 14, 2013, the Court’s efforts to prepare the case for trial beginning on August 14, 2013, and the accommodations to their normal schedules made by the jurors.
App., Vol. II at 550-51.[5]
The problem, however, is that the district court’s discussion is simply too vague and unconvincing to justify the severe sanction of exclusion. Turning first to the impact of a continuance on the summoned jurors, the district court, at best, engaged in educated speculation as to what advance preparations the summoned jurors may have made in order to appear in court on the scheduled trial date. And, even assuming the district court was correct in its speculation, I am not persuaded that such advance preparations can be equated with the sacrifices made by jurors who actually appear in court prepared to serve as jurors.[6] In other words, from the perspective of a potential juror, preparing to appear at a trial is a far cry from actually appearing at the trial: at a trial, jurors are actually away from their jobs, homes, and families and likely have incurred substantial costs (both monetary and otherwise) in doing so. The same simply cannot be said in a pretrial situation, such as occurred here. Indeed, the proposed four to eight-week continuance would have relieved, at least temporarily, the summoned jurors from actually incurring any costs or sacrifices associated with appearing in court.
Vagueness also plagues the district court’s discussion of the preparations that its staff and the visiting judge engaged in, as well as, more importantly, its assertion that those preparations would be “squandered” by a continuance. To be sure, I have no doubt that the court, its staff and the visiting judge engaged in some type of preparatory work for trial, including, perhaps, resolving pretrial motions or preparing jury instructions. But I find it difficult to understand how this preparatory work would be “squandered” because of a continuance. Because the district court did not elaborate on what preparations had been made for trial and why those efforts would be lost if a continuance were granted, I am left to afford this no weight in assessing the district court’s decision to exclude the 911 recording.
V
None of the Wicker factors point to exclusion as the proper sanction in this case. Nor do the so-called “other concerns” cited by the district court. In addition, the district court gave no consideration whatsoever to any lesser sanctions, as required by Wicker. Consequently, I conclude that the district court committed a clear error of judgment and exceeded the bounds of permissible choice in selecting total exclusion of the 911 recording as the proper sanction in this case. As a result, I would reverse the district court’s order and re *689 mand with directions to admit the 911 recording at trial.

. As the district court explained in its order on remand, the evidence presented at the evidentiary hearing indicated "that the location information provided by the SCRECC” on the second CAD report "involved some form of anomaly that made it appear that the phone call came from a location miles away from [Yepa]'s residence.” App., Vol. II at 547.

. The district court found that, "[a]t most, the JPPD can be criticized for not asking Agent Bourgeois if the FBI wanted the evidence it had collected.” App., Vol. II at 542. Officer Soto’s testimony, however, makes clear that he knew the FBI would have wanted all of the evidence related to the case, including the victim’s cell phone. And Soto was apologetic for failing to turn the phone over to Agent Bourgeois. Id., Vol. V at 975 (when asked if he had "an intent of any sort to keep this piece of evidence from the FBI or from the defense,” Soto testified: "No, ma’am. There was nothing intentional or malicious: just I had too much on my plate maybe.”).

. It is undisputed that the 911 recording was disclosed to the defense in June 2013 during the course of discovery.

. For example, on December 5, 2013, while the government’s first interlocutory appeal was pending, Yepa filed a motion for release from custody. The district court denied that motion in a written order issued on January 23, 2014. In that order, "[t]he district court found that '[t]he United States ha[d] not intentionally delayed trial of this case’ and that ‘the period between [Yepa's] arrest and the scheduled August 2013 trial’ was reasonable.” Aplt. Br. at 24 (quoting App., Vol. II at 333). The district court also found in that same order that, ”[b]y the time this case comes to trial, Defendant will have been detained for a very small fraction of the term of imprisonment he faces if convicted of first degree murder or aggravated sexual abuse resulting in death.” App., Vol. II at 332.

. The "Order of August 11, 2013” referred to by the district court contains only one sentence discussing the district court’s preparations for trial: "The Court and its staff have devoted many hours in preparing this case for trial on the August docket, hours that could have been devoted to other time-sensitive matters deserving the Court’s immediate attention.” Dist. Ct. Docket No. 121 at 5.

. In Wicker, for example, the district court’s decision to exclude evidence (and our affir-mance thereof) was driven, in part, by the fact that "the jury had already been selected and th[e] trial was ready to begin.” 848 F.2d at 1061.