**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 12 1999**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

    No.  98-1231

TERRY LYNN NICHOLS,

    Defendant-Appellant.

**ORDER**

Before **PORFILIO**, **BALDOCK**, and **BRORBY**, Circuit Judges.

This matter is before the court on counsel's application for attorney's fees and expenses.  In a separate sealed order issued today, we have outlined the fees and expenses which will be paid to counsel for their representation of defendant Terry Lynn Nichols in this matter.  Through this order, we will provide our reasoning for the conclusions we have drawn.  It is our intent to provide guidance to both counsel and the court for future appeals invoking the mandate of 21 U.S.C. §848(q).

Defendant Terry Lynn Nichols was tried as a co-conspirator in the bombing of the Alfred P. Murrah Federal Building in Oklahoma City, Oklahoma. *See United States v. Nichols*, 169 F.3d 1255, 1260 (10th Cir. 1999), *petition for cert. filed*, (U.S. June 30, 1999)(No. 99-5063)(providing factual background). Throughout the proceedings, Mr. Nichols has had the benefit of appointed counsel. In orders dated July 10 and July 22, 1998, respectively, we appointed three lawyers to represent him. Although the orders did not make specific reference to our appointing authority, the fair inference is that counsel were appointed pursuant to 21 U.S.C. §848(q)(10).

Unlike appointments made in most direct criminal appeals under the Criminal Justice Act, §848(q) speaks specifically to the availability of counsel for indigent defendants in capital litigation. The current version of the statute provides:

> (4)(A) Notwithstanding any other provision of law to the contrary, in every criminal action in which a defendant is charged with a crime which may be punishable by death, a defendant who is or becomes financially unable to obtain adequate representation or investigative, expert, or other reasonably necessary services at any time either-
>     (i) before judgment; or
>     (ii) after the entry of a judgment imposing a sentence of death but before the execution of that judgment;
> shall be entitled to the appointment of one or more attorneys and the furnishing of such other services in accordance with paragraphs (5), (6), (7), (8), and (9).

21 U.S.C. §848(q)(4)(A). Here, the government sought the death penalty from the outset. Consequently, counsel were appointed pursuant to this provision. We continued those appointments on appeal. *See* Volume VII, *Guide To Judiciary Policies and Procedures*, Ch. VI, section 6.02B(2)(noting that courts may consider continuation of multiple counsel and

higher rates under this provision even where the matter is no longer a capital case). The particular issue before us, then, is the appropriate analysis for payment of fees under §848(q).

Prior to April of 1996, our task in analyzing fees under the statute was directed in large part by the language of §848(q)(10). At that time, that paragraph stated:

> Notwithstanding the rates and maximum limits generally applicable to criminal cases and any other provision of law to the contrary, the court shall fix the compensation to be paid to attorneys appointed under this subsection and the fees and other expenses to be paid for investigative, expert, and other reasonably necessary services authorized under paragraph (9), at such rates or amounts as the court determines to be *reasonably necessary* to carry out the requirements of paragraphs (4) through (9).

21 U.S.C. §848(q)(10)(1995)(emphasis added). When Congress passed the Anti-Terrorism and Effective Death Penalty Act, however, the language of paragraph 10 was amended. It now provides:

> Compensation shall be paid to attorneys appointed under this subsection at a rate of not more than $125 per hour for in-court and out-of-court time. Not less than 3 years after April 24, 1996, the Judicial Conference is authorized to raise the maximum for hourly payment specified in the paragraph up to the aggregate of the overall average percentages of the adjustments in the rates of pay for the General Schedule made pursuant to section 5305 of Title 5 on or after such date. After the rates are raised under the preceding sentence, such hourly range may be raised at intervals of not less than one year, up to the aggregate of the overall average percentages of such adjustments made since the last raise under this paragraph.

21 U.S.C. §848(q)(10)(A). Notably, the amended version does not contain reference to the reasonableness of services performed. Rather, the focus of the new section is on adjustments to the rates of pay which will be afforded appointed counsel. The legislative history of the statute is silent on the reasons behind the redaction.

Nevertheless, reasonableness must continue to be the standard for evaluating the appropriateness of fees under this statute. To conclude otherwise would require us to reject both Supreme Court precedent and the statutory mandate of the Criminal Justice Act. *See In re Berger*, 498 U.S. 233, 235 (1991)(per curiam)(identifying the §848 inquiry as "what level of compensation is 'reasonably necessary' to ensure that capital defendants receive competent representation . . . ."); *18 U.S.C. §3006A(d)*(requiring that attorneys be compensated for "time reasonably expended out of court"); *see also United States v. Kennedy*, 64 F.3d 1465, 1470 (10th Cir. 1995)(noting that the defendant bears the burden of showing services are "necessary for adequate representation" under the Criminal Justice Act.).

Moreover, although redacted from paragraph 10 of §848(q), the reasonableness standard may still be gleaned from the language of amended paragraph 9, which states:

> Upon a finding that investigative, expert, or *other services are reasonably necessary* for the representation of the defendant, whether in connection with issues relating to guilt or the sentence, the court may authorize the defendant's attorneys to obtain such services on behalf of the defendant and, if so authorized, shall order the payment of fees and expenses therefor under paragraph (10).

21 U.S.C. §848(q)(9)(emphasis added). Through inclusion of the reasonableness language in this paragraph, Congress made clear its intent to retain judicial discretion as a tool in evaluating the appropriate amount of fees to pay for services rendered in capital cases. It would be anomalous to apply a reasonableness test with regard to investigative services but abandon it with respect to attorney's fees. In addition, the reference in paragraph 9 to

-4-

paragraph 10 appears deliberate.  Paragraph 9 provides that the court may authorize payment of "fees and expenses" under paragraph 10.  We may do so, however, only for those services which are reasonably necessary.  The logical result is that the reasonableness standard applies to paragraph 10 fees as well.

Our goal in analyzing the meaning of any statute is to "give effect to the will of Congress."  *Griffin v. Oceanic Contractors, Inc.*  458 U.S. 564, 570 (1982).  We have interpreted that mandate to mean that where a statute is clear on its face, we give its words literal effect.  *See Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455, 1460 (10th Cir. 1997).  "When interpreting statutory language, however, appellate courts must examine the . . . language in context, not in isolation."  *True Oil Co. v. Commissioner*, 170 F.3d 1294, 1299 (10th Cir. 1999).  We "'must look to the particular statutory language at issue, as well as the language and design of the statute as a whole.'"  *Id.* (quoting *Kmart Corp. v. Cartier, Inc*., 486 U.S. 281, 291 (1988)).  Our conclusion that §848(q) incorporates a reasonableness assessment meets these important goals and effectuates the will of Congress in drafting the appointment statutes.

Having determined the appropriate standard, we now turn to the vouchers at hand.  Counsel have provided us with accurate and timely billing records.  In addition, all three lawyers submitted, upon our request, supplements to their fee applications.  The court has high regard for counsel and appreciates not only their efforts to comply with our requests, but also the vigorous and committed advocacy they have provided for their client throughout

these proceedings.

Nevertheless, we are faced with a very difficult task. The balance between providing counsel with fair payment and, at the same time, acting as trustees of the public's funds, is most precarious. We are committed not only to compensating counsel adequately for work that is extremely difficult, but also to acting as guardians of the taxpayers' dollars. To this extent, we are duty bound to undertake a very considered evaluation of the reasonableness of each and every time entry. The undertaking is particularly important in a case such as this, where the fees generated were very large.

The fee amounts approved in the separate order we have entered today are a reflection of our attempt to balance these competing interests. It is an undertaking which is not peculiar to this case or these lawyers. Indeed, we applaud counsel's patience as we have grappled with these issues. We have settled on a standard which will, we hope, benefit the bench and bar in all future matters. The issue presented here will arise again, and we as a court will apply the same standards and undertake the same difficult evaluation. In capital cases, and in all matters arising under the Criminal Justice Act, it is a duty we take very seriously.

Entered for the Court
PATRICK FISHER, Clerk of Court

by:    Elisabeth A. Shumaker
       Chief Deputy Clerk

-6-

**UNITED STATES COURT OF APPEALS**
**Tenth Circuit**
**Byron White United States Courthouse**
**1823 Stout Street**
**Denver, Colorado 80294**
**(303) 844-3157**

Patrick J.  Fisher, Jr.                                                                 Elisabeth A. Shumaker
Clerk                                                                                          Chief Deputy Clerk

March 15, 1999


**TO:**  ALL RECIPIENTS OF THE OPINION

**RE:**  98-1231, *United States v. Nichols*
Filed on February 26, 1999

The opinion filed on February 26, 1999, contains a typographical error on page one of the slip opinion.  The section that lists the attorneys for the Amici Curiae should appear as follows:

Paul G. Cassell, University of Utah College of Law, Salt Lake City, Utah; Robert F. Hoyt, Karan Bhatia, Reginald J. Brown, and Jennifer Grishkin, Wilmer, Cutler & Pickering, Washington, D.C., on the brief for Amici Curiae.

A corrected copy of page one of the opinion is attached for your convenience.


Sincerely,
Patrick Fisher, Clerk of Court

By:
Keith Nelson
Deputy Clerk


encl.

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 26 1999**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

       Plaintiff - Appellee,

v.

TERRY LYNN NICHOLS,

       Defendant - Appellant,

No. 98-1231

MARSHA KIGHT; MARTIN CASH;
NATIONAL ORGANIZATION FOR
VICTIM ASSISTANCE,

       Amici Curiae.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 96-CR-68-M)**

Michael E. Tigar, (Susan L. Foreman, Adam Thurschwell, and Jane B. Tigar, with him on the briefs), Boulder, Colorado, for Defendant-Appellant.

Sean Connelly, Special Attorney to the U.S. Attorney General (Patrick M. Ryan, United States Attorney, Oklahoma City, Oklahoma, with him on the brief), Denver, Colorado, for Plaintiff-Appellee.

Paul G. Cassell, University of Utah College of Law, Salt Lake City, Utah; Robert F. Hoyt, Karan Bhatia, Reginald J. Brown, and Jennifer Grishkin, Wilmer, Cutler & Pickering, Washington, D.C., on the brief for Amici Curiae.

Before **PORFILIO**, **BALDOCK**, and **BRORBY**, Circuit Judges.

**PORFILIO**, Circuit Judge.

Terry Lynn Nichols appeals his conviction and sentence after having been found guilty of conspiring to use a weapon of mass destruction, 18 U.S.C. § 2332a, and eight counts of involuntary manslaughter, §§ 1114, 1112. The jury acquitted him on counts of using a weapon of mass destruction, § 2332a, destruction by explosives, § 844(f), and eight counts each of first- and second-degree murder, §§ 1114, 1111. The trial court sentenced Mr. Nichols to life imprisonment on the conspiracy count and six years on each of the manslaughter counts, all terms to run concurrently. The court also ordered Mr. Nichols to pay $14.5 million in restitution. After consideration of the issues, we see no error in the actions of the district court and affirm its judgment.

Mr. Nichols was the co-conspirator of Timothy James McVeigh in the planning and subsequent bombing of the Alfred P. Murrah Federal Building in Oklahoma City. The pertinent details of the crime are fully set forth in our decision of Mr. McVeigh's appeal, *see United States v. McVeigh*, 153 F.3d 1166, 1176-79 (10th Cir. 1998), *petition for cert. filed*, ___ U.S.L.W. ___ (U.S. Jan. 4, 1999) (No. 98-7500), and will not be repeated here. To the extent evidence from Mr. Nichols' trial is essential to the disposition of the issues he presents to us, we shall delineate it.

- 2 -

Mr. Nichols submits eleven grounds for reversal. He argues the district court erred before and during trial when it: (1) held intent to kill is not a required element of 18 U.S.C. § 2332a; (2) chose not to instruct the jury on lesser-included offenses of section 2332a; (3) admitted the expert testimony of Linda Jones; (4) excluded the expert testimony of Frederic Whitehurst for discovery violations; and (5) admitted the testimony of a co-conspirator who testified in exchange for promises of leniency. He further contends (6) the accumulation of all the errors adversely affected his right to a fair trial. Mr. Nichols also claims the district court erred during sentencing when it: (7) sentenced him based on the guideline for first-degree murder; (8) failed to explain why it chose not to depart downward; (9) failed to consider his personal characteristics; and (10) ordered $14.5 million in restitution. Lastly, Mr. Nichols contends (11) the judgment entered is in error. We consider these issues in order.

## I.     Is Intent to Kill a Required Element of 18 U.S.C. § 2332a?

Mr. Nichols argues the district court erred when it failed to instruct the jury that 18 U.S.C. § 2332a incorporates a specific intent to kill as an element of the offense. The argument relies on the statute's distinction between actions that result in death and those that do not. The penalty provision of the statute provides that whoever violates section 2332a "shall be imprisoned for any term of years or for life, and *if death results*, shall be punished by death or imprisoned for any term of years or for life." 18 U.S.C. § 2332a(a)

(1994) (emphasis added).  Mr. Nichols claims the phrase "if death results" is an *actus reus* element of the offense thus necessitating a specific intent to kill.

We rejected this argument in ***McVeigh***.  There we held:

The fact that the statute authorizes the death penalty "if death results" from the use of the weapon of mass destruction does not persuade us that the statute incorporates "intent to kill" as an element.  Looking at the plain language and structure of the statute, we conclude that the phrase "if death results" is a sentencing factor rather than an element of the offense. . . . [¶] Further, even if the phrase . . . were to be construed as an element of the offense rather than a sentencing enhancement, it would not be an intent element but only an element of factual consequences.  Nothing in § 2332a(a) links the "if death results" language of the statute to any scienter whatsoever.

***McVeigh***, 153 F.3d at 1194-95.

Mr. Nichols acknowledges the ***McVeigh*** decision but argues at great length the case is wrongly decided on this point.  His thesis, however, ignores the rule of *stare decisis*.  "We cannot overrule the judgment of another panel of this court.  We are bound by the precedent of prior panels absent en banc reconsideration or a superseding contrary decision by the Supreme Court." ***In re Smith***, 10 F.3d 723, 724 (10th Cir. 1993); ***see also Hurd v. Pittsburgh State Univ.***, 109 F.3d 1540, 1542 (10th Cir. 1997).  Mr. Nichols attempts to avoid this rule by arguing Mr. McVeigh has petitioned for en banc review.  Were this a sufficient ground for departure from precedent, and it is not, the argument has been mooted by the denial of rehearing en banc. ***See United States v. McVeigh***, No. 97-1287 (10th Cir. Oct. 6, 1998) (unpublished order).

Mr. Nichols also argues *McVeigh* runs counter to the Supreme Court's recent decision in *Almendarez-Torres v. United States*, 523 U.S. 224 (1998). This attempt to circumvent our precedent also fails. *Almendarez-Torres* was available to and expressly considered by the *McVeigh* panel. *See McVeigh*, 153 F.3d at 1194-95. To consider the effect of *Almendarez-Torres* now would be to revisit ground already covered. This we may not do.

**II. Should the District Court Have Instructed the Jury on Lesser-Included Offenses of 18 U.S.C. § 2332a?**

Mr. Nichols urges the district court erred when it failed to instruct the jury on lesser-included offenses of 18 U.S.C. § 2332a. He grounds this argument upon a theory that section 2332a incorporates multiple offenses graduated by levels of intent, comparable to first- and second-degree murder.

Once again, the identical argument was soundly rejected in *McVeigh*: "[T]he Supreme Court made it clear that the Constitution does not require a court to instruct the jury on lesser-included offenses that do not exist under the law. . . . We reject [Mr. McVeigh's] argument, and therefore, we find that the district court properly denied the requests for lesser-included offense instructions [on the section 2332a count]." *McVeigh*, 153 F.3d at 1197 (citing *Hopkins v. Reeves*, 524 U.S. 88, ___, 118 S. Ct. 1895, 1901 (1998)). We adhere to our earlier decision.

**III.    Did the District Court Err by Allowing Linda Jones to Give Expert Opinions About the Type and Size of the Bomb?**

Mr. Nichols next contends the district court erred when it permitted Linda Jones, a forensic explosives expert from the Ministry of Defense in England, to give opinions about the type and size of the bomb that destroyed the Murrah building. Ms. Jones reviewed photographs, videotapes, charts, plans, and physical evidence recovered from the Oklahoma City crime scene. Key to her testimony was a purported piece of a Ryder truck's wooden cargo bay, labeled as Q507 and eventually admitted into evidence.[1] The piece of the cargo bay was impregnated with ammonium nitrate. At trial, Ms. Jones explained, based on damage to the Murrah building and nearby vehicles, that the bomb was a "high-performance explosive of midrange velocity and performance." She also opined the damage was caused by a large 3000-6000 pound bomb in the cargo compartment of a Ryder truck. Although Ms. Jones could not identify the exact explosive device, she testified the damage was "consistent with a bomb containing or including an ammonium-nitrate-based explosive" and that it could have been detonated with Primadet blasting caps.

---

[1]Although the piece was admitted into evidence as government's exhibit 664, the parties have consistently referred to it as "Q507." We shall persist in the reference for the sake of clarity.

Mr. Nichols claims the district court should have, at the very least, held an evidentiary hearing to determine the reliability of portions of scientific information relied upon by Ms. Jones. He also believes the court should have excluded the testimony because Ms. Jones' "opinions exceeded her expertise and the probative value of her testimony was substantially outweighed by its unfair prejudice."

### A. Should the District Court Have Held an Evidentiary Hearing to Determine the Reliability of the Scientific Testimony?

Mr. Nichols first argues the district court should have held a preliminary hearing to determine whether the scientific foundation for portions of Ms. Jones' expert testimony met the threshold standard of reliability set forth in Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The district court explained Mr. Nichols' position:

> The principal dispute centers on . . . analytical testing of Q507, an object taken from the site of the explosion and tested at the FBI lab and at another location. Defense counsel contend that information made known to them through discovery suggests the possibility of contamination of the items tested and the testing equipment; that the FBI laboratory lacked proper protocols and prescribed procedures; that the testing methodologies used were inappropriate and that unqualified persons participated in performing the tests. In sum, the defense argues that the government must prove to the court, outside the presence of the jury, that appropriate scientific methods were properly applied before the test results and conclusions drawn from them can be admitted as relevant and reliable scientific evidence.

*United States v. McVeigh*, 955 F. Supp. 1278, 1279 (D. Col. 1997). After careful review of the defendant's arguments and submissions, the district court declined to hold a

hearing and reserved ruling on the admissibility of the evidence until the testimony was offered at trial.

Before proceeding to the merits of this contention, we must first address under what standard we should review the denial of an evidentiary hearing in the *Daubert* context. Neither our circuit nor any other has squarely considered the matter. The most helpful discussion of the issue arose in *United States v. Call*, 129 F.3d 1402 (10th Cir. 1997). There, we stated *Daubert* does not mandate an evidentiary hearing and that on appeal we simply require "a sufficiently developed record in order to allow a determination of whether the district court properly applied the relevant law." *Id.* at 1405. Although the *Call* majority did not directly declare that we review the denial of a *Daubert* hearing for an abuse of discretion, it did so by implication. Indeed, the dissent in *Call* recognized the implication and adopted the standard as correct. *See id.* at 1406 (Ebel, J., dissenting).

The implied standard of review in *Call* is consistent with our general rule that decisions on the propriety of evidentiary hearings are reviewed for an abuse of discretion. *See, e.g.*, *Johnson v. Gibson*, 164 F.3d 496, 508 (10th Cir. 1998) (reviewing denial of hearing on 28 U.S.C. § 2254 motion for abuse of discretion); *Robinson v. City of Edmond*, 160 F.3d 1275, 1286 (10th Cir. 1998) (hearing on attorneys' fees); *McVeigh*, 153 F.3d at 1185-88 (hearing on juror misconduct); *United States v. Glass*, 128 F.3d 1398, 1408 (10th Cir. 1997) (hearing on motion to suppress); *United States v. Rockwell*

***Int'l Corp.***, 124 F.3d 1194, 1199 (10th Cir. 1997) (hearing on breach of plea agreement); ***United States v. Whalen***, 976 F.2d 1346, 1348 (10th Cir. 1992) (hearing on 28 U.S.C. § 2255 motion); ***United States v. Sands***, 968 F.2d 1058, 1066 (10th Cir. 1992) (hearing on new trial motion under Fed. R. Crim. P. 33). Mr. Nichols has not offered, nor could we find, a compelling reason to depart from this general rule.

Furthermore, the rules of evidence support this conclusion. ***Daubert*** challenges, like other preliminary questions of admissibility, are governed by Fed. R. Evid. 104. ***See Summers v. Missouri Pac. R.R. Sys.***, 132 F.3d 599, 603 (10th Cir. 1997). That rule provides that a hearing outside the presence of the jury "shall be . . . conducted when the interests of justice require." Fed. R. Evid. 104(c) (1994). The requirement of the "interests of justice" implies discretion on the part of the trial court to be reviewed only for an abuse. We have held as much with respect to "interests of justice" requirements found in other rules and statutes. ***See, e.g.***, ***United States v. Custodio***, 141 F.3d 965, 966 (10th Cir. 1998) (motion for new trial under Fed. R. Crim. P. 33); ***Trierweiler v. Croxton & Trench Holding Corp.***, 90 F.3d 1523, 1544-45 (10th Cir. 1996) (motion for change of venue under 28 U.S.C. § 1404(a)); ***United States v. Edwards***, 69 F.3d 419, 437 (10th Cir. 1995) (motion for deposition under Fed. R. Crim. P. 15(a)). We review the district court's decision here for an abuse of discretion.

The trial court in this case did not abuse its discretion when it declined to hold a preliminary evidentiary hearing. The district court explained its decision by noting that

"[t]he challenged evidence does not involve any new scientific theory and the testing methodologies are neither new nor novel. . . . [¶] [T]he testing methodologies employed . . . are all well-known techniques routinely used by chemists to determine the elemental composition of unknown samples." *McVeigh*, 955 F. Supp. at 1279. Rather, the court noted that the contentious issue was whether the test results were undercut by flaws in the laboratory tests, a matter involving the credibility of witnesses and weighing of the evidence, both of which were more suitable for resolution by the jury. The court stated:

> The challenges are to [compliance with protocol;] the collection and handling of the items tested; the manner in which the lab work was performed; the care and maintenance of the equipment used and the influence of general operating conditions in the lab. These are matters that may determine the admissibility of the opinion evidence and well may influence the jury's consideration of it if it is received. There is nothing prejudicial to the defendant in reserving ruling on the admission of the opinions and conclusions to be drawn from the testing until it is offered at trial. . . . All of the necessary foundation must be proved and the adequacy of the showing made will be determined before questions asking for opinions and conclusions will be permitted. . . . If *voir dire* requires questioning that may be too prolonged or that may include matters inappropriate for hearing by the jury, it may be done during a recess period.

*Id.* at 1280-81. The court further reasoned:

> The showing required to determine admissibility under Fed. R. Evid. 104(a) will require the production of evidence that should be presented to the jury under Rule 104(e) to assist them in evaluating the credibility and weight to be given to the challenged testimony. . . . [¶] Because the accused has the right to have the jury hear evidence relevant to the weight and credibility of opinion evidence, the necessary foundation for admission should be presented to the jury. That procedure avoids the duplication that would result from a pretrial hearing.

*Id.* at 1279-80.

The trial court's method of conserving judicial resources is consistent with the Advisory Committee Notes to Rule 104. The Notes state that:

> Not infrequently the same evidence which is relevant to the issue of establishment of fulfillment of a condition precedent to admissibility is also relevant to weight or credibility, and time is saved by taking foundation proof in the presence of a jury. Much evidence on preliminary questions, though not relevant to jury issues, may be heard by the jury with no adverse effect. A great deal must be left to the discretion of the judge who will act as the interests of justice require.

Fed. R. Evid. 104 Adv. Comm. Notes (1994).

The district court's approach also comports with our decision in *United States v. Davis*, 40 F.3d 1069 (10th Cir. 1994). In *Davis*, we approved a district court's decision to determine in the presence of the jury whether scientific protocol was followed. We made the following observations: "[The district court] had the opportunity to determine whether protocol was followed before [the witness] testified . . . . The district court thus conducted the functional equivalent of a preliminary hearing. . . . [¶] The [court] clearly complied with *Daubert*'s second prong by hearing lengthy testimony about protocol before the expert gave her opinion." *Id.* at 1075. The district court's actions in Mr. Nichols' case were no different. The court's rulings were flawless.

**B.      Should the District Court Have Excluded Ms. Jones' Testimony Because Her Opinions Exceeded Her Expertise and the Probative Value of the Testimony was Substantially Outweighed by its Unfair Prejudice?**

Mr. Nichols next argues the trial court should have excluded Ms. Jones' testimony because her "opinions exceeded her expertise and the probative value of her testimony was substantially outweighed by its unfair prejudice." Before broaching these issues, we must first address the government's claim that Mr. Nichols did not properly preserve them for appeal. Resolution of the matter affects the standard of review, thus suggesting we consider the government's concerns before proceeding.

The government argues that although Mr. Nichols may have raised these challenges to Ms. Jones' testimony in a motion in limine prior to trial, Mr. Nichols never renewed those challenges during trial, thus rendering them improperly preserved on appeal. Generally, a pretrial motion in limine will not preserve an objection if the objection is not renewed at the time the evidence is introduced. *See McVeigh*, 153 F.3d at 1200; *United States v. Sides*, 944 F.2d 1554, 1559-60 (10th Cir. 1991). There is an exception to this rule which applies only where "the issue (1) is fairly presented to the district court, (2) is the type of issue that can be finally decided in a pretrial hearing, and (3) is ruled upon without equivocation by the trial judge." *United States v. Mejia-Alarcon*, 995 F.2d 982, 986 (10th Cir. 1993). Our application of these principles leads us to conclude Mr. Nichols' contentions are not adequately preserved for appeal.

The first issue we address is whether Mr. Nichols in fact failed to renew his objections at the time Ms. Jones' testimony was introduced. To assist in this determination, our circuit rules provide that "if the appeal is based upon a failure to admit

or exclude evidence . . . or any other act or ruling for which a party must record an objection to preserve the right to appeal, [a party must include in the initial brief] a statement as to where a proper objection and the court's ruling thereon may be found in the record." 10th Cir. R. 28.2(c) (1996); *see also* 10th Cir. R. 28.2(C)(3) (1999). Mr. Nichols has not complied with this rule. Given his failure to counter the government's assertions on this point, we must assume Mr. Nichols indeed failed to renew his objections during trial. Furthermore, our independent review of the record corroborates the assumption. We can find no pertinent objections to Ms. Jones' testimony during trial.

We next address whether the *Mejia-Alarcon* exception to the general rule nevertheless applies. Given that the three parts of the exception are stated in the conjunctive, we must find each part satisfied to preserve the objection on appeal. The government contends the last of the requirements is not present because "rather than rule definitively and unequivocally prior to trial, the court reserved ruling on defense challenges to Jones and other prosecution experts." The record supports this assertion, for in ruling on the admissibility of the testimony of Ms. Jones and others, the district court stated that defense objections regarding "the qualification of the witness and to the particular offerings of opinions and conclusions" will be heard "during the course of each trial." *McVeigh*, 955 F. Supp. at 1281. Neither Mr. Nichols' reply brief nor the record indicates anything to the contrary. Because Mr. Nichols failed to satisfy one of the prerequisites, we conclude he did not properly preserve these issues for appeal.

Accordingly, we review them only for plain error. *See* Fed. R. Crim. P. 52(b) (1994); *United States v. Olano*, 507 U.S. 725, 731-37 (1993).

Mr. Nichols first contends Ms. Jones' opinions exceeded her expertise and that the district court should have excluded her testimony. *See* Fed. R. Evid. 702 (1994). Mr. Nichols states: "Jones is a forensic chemist; if her opinions had resulted from chemical testing she performed in [her] lab, there would be no challenge offered here. Her testimony, however, was nothing of the kind. Her opinions related instead to the size and type of the device employed."

The admission of expert testimony in a federal trial is governed by Fed. R. Evid. 702. That rule provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." *Id.* We have drawn from this rule two requirements that a party seeking to offer expert testimony must satisfy before the trial judge may permit the witness to testify.

First, the witness must be an "expert," thus making the testimony reliable. *See City of Hobbs v. Hartford Fire Ins. Co*, 162 F.3d 576, 586 (10th Cir. 1998). District courts have broad discretion in determining the competency of expert witnesses. *See Gust v. Jones*, 162 F.3d 587, 594 (10th Cir. 1998). "The fields of knowledge which may be drawn upon are not limited merely to the 'scientific' and 'technical' but extend to all

'specialized' knowledge." Fed. R. Evid. 702 Adv. Comm. Notes (1994). Notably, where, as here, the testimony is based upon experience or training, we need not apply the *Daubert* factors to determine its reliability. *See Compton v. Subaru of Am., Inc.*, 82 F.3d 1513, 1518-19 (10th Cir. 1996); *Carmichael v. Samyang Tire, Inc.*, 131 F.3d 1433, 1435-36 (11th Cir. 1997), *cert. granted*, 118 S. Ct. 2339 (1998); *McKendall v. Crown Control Corp.*, 122 F.3d 803, 807-08 (9th Cir. 1997); *United States v. Jones*, 107 F.3d 1147, 1158 (6th Cir. 1997).

The district court found Ms. Jones to be an expert, and we agree. At the time of the trial, Ms. Jones was a principal forensic investigator and fellow (the most senior title) for the Defense Evaluation and Research Agency of the Ministry of Defense in England. She had twelve years of experience investigating crimes involving explosives for British police agencies. The record further indicates she had worked on hundreds of bombing cases, including IRA bombings, and visited a dozen bomb scenes. Ms. Jones is also a trained chemist, a fellow of the Royal Society of Chemistry, and a member of the Institute of Explosives Engineers. Moreover, she has earned the honor of being named an Officer of the Order of the British Empire by the Queen of England.

Ms. Jones' expertise exceeds the Rule 702 reliability threshold. She was well qualified, based on her training and experience as a leading bomb expert in a nation that has experienced a significant number of recent explosions, to explain the nature and characteristics of explosive devices. Ms. Jones' capacity to estimate the bomb contained

3000-6000 pounds of explosives was well within the expertise of a person with twelve years' experience investigating explosions of varying size. Furthermore, as an experienced forensic chemist, Ms. Jones could rely on fellow expert Steven Burmeister's finding of ammonium nitrate crystals on Q507 in coming to her conclusion that the bomb could have contained an ammonium-nitrate-based explosive. At best, Mr. Nichols' challenges to Ms. Jones' conclusions go to the weight rather than the admissibility of her testimony.

The second requirement for admitting expert testimony is that it must assist the trier of fact. *See City of Hobbs*, 162 F.3d at 586. The probative value of Ms. Jones' testimony cannot seriously be placed into question. Though Ms. Jones could not determine all of the components of the bomb, her statement that the damage was consistent with certain types of devices and inconsistent with others was plainly relevant. Her description of the composition of the bomb and its possible detonation device tended "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the [testimony]." Fed. R. Evid. 401 (1994). The government's evidence had linked Mr. Nichols to a purchase of ammonium-nitrate fertilizer and also established he was known to have possessed Primadet blasting caps. Thus, Ms. Jones' testimony enhanced the prosecution's case that Mr. Nichols conspired to use a weapon of mass destruction because she testified the bomb was consistent with the materials the prosecution proved to be within the

possession of Mr. Nichols.  Having concluded that Ms. Jones was an expert and her testimony was relevant, we can find no error, let alone an obvious and substantial one, in permitting her to testify.

Mr. Nichols next claims the probative value of Ms. Jones' testimony was substantially outweighed by its unfair prejudice.  *See* Fed. R. Evid. 403 (1994).  We disagree.  "The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, ___, 117 S. Ct. 644, 650 (1997).  The Committee Notes to Rule 403 explain, "'[u]nfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403 Adv. Comm. Notes (1994).  Ms. Jones' testimony was limited to a description of the bomb, and she made no direct references to the defendant.  Ms. Jones did not opine that Mr. Nichols created the bomb, but only that the bomb was consistent with materials that prosecutors otherwise proved to be within the possession of Mr. Nichols.  Again, we find no error here.


**IV.    Did the District Court Properly Exclude Mr. Nichols' Expert Witness as a Sanction for Violation of Discovery Rules?**

Mr. Nichols claims he should have been allowed to call Dr. Frederic Whitehurst, an FBI agent on administrative leave, as an expert witness.  He contends Dr. Whitehurst

would have challenged the testimony of government expert, Steven Burmeister, about the ammonium nitrate found on Q507. The district court did not permit Dr. Whitehurst to appear because it held the defense had not given the government adequate notice of an intent to call him. Mr. Nichols claims the sanction was unwarranted and the court should have granted a short continuance to permit the government to prepare for cross-examination. To exclude the witness, he further argues, infringed upon his Sixth Amendment right to compulsory process and his Fifth Amendment right to due process. We review a district court's decision to exclude a defense witness as a discovery sanction for an abuse of discretion. *See United States v. Russell*, 109 F.3d 1503, 1509 (10th Cir. 1997).[2] "Excluding witnesses for failure to comply with discovery orders, if not an abuse of discretion, does not violate a defendant's Sixth Amendment right to compulsory process." *Id.* Allegations of a due process violation are reviewed *de novo*. *See United States v. One Parcel of Real Property Described as Lot 41*, 128 F.3d 1386, 1391 (10th Cir. 1997).

The defense case began on December 2, 1997, and ended December 11, 1997. Mr. Nichols' defense team did not notify the government of its intent to call Dr. Whitehurst until it did so by fax at 9:30 PM on December 8, 1997. At a bench conference at 8:45

---

[2]Mr. Nichols contends this standard of review should not apply here. He asks us to find the government intimidated Dr. Whitehurst, and therefore, invites us to resort to a more exacting standard of review. For reasons we set forth below, we must refuse the invitation.

AM the next day, counsel advised the court he wanted to call Dr. Whitehurst the following morning on December 10. During a lengthy exchange, defense counsel told the court Dr. Whitehurst would testify that the government's evidence about how "these ammonium nitrate crystals can be associated with an explosive event . . . [was] contrary to elementary scientific principles; that is to say, contrary to what Whitehurst [knew] about crystallography." The court ruled it would exclude the testimony because the defense had not given "fair notice to the Government." The court grounded its decision exclusively on Fed. R. Crim. P. 16(d)(2).

The following day, Mr. Nichols filed a memorandum and written offer of proof outlining why the court should reconsider its ruling. His submission stressed that Dr. Whitehurst was needed to testify "as expert rebuttal" to two of the government's experts. The papers also set forth the nature of Dr. Whitehurst's expected testimony but did not suggest the court consider a recess to allow the government to prepare.

Appended to the offer was a signed declaration of Dr. Whitehurst's personal attorney explaining why Dr. Whitehurst had not come forward sooner. The declaration stated, in pertinent part, that "[t]he threat [by representatives of the Federal government] to take administrative action against Dr. Whitehurst on the basis of his deposition testimony and the threat to evaluate Dr. Whitehurst's future status with the FBI . . . *chilled* Dr. Whitehurst and his counsel." (emphasis added). Notably, the declaration contains no direct statement that Dr. Whitehurst previously refused to give, or was even

dissuaded from giving, testimony because of the alleged threats. The only claim is that between the date of the so-called "threats" and December 5, 1997, "neither Dr. Whitehurst nor his counsel . . . had any substantive discussions or other communications with the Nichols defense team." The court reviewed the proffer and chose not to change its ruling. We can see no abuse of discretion in this holding.

The record reflects that as of September 25, 1997, the parties had exchanged expert witness lists and summaries, pursuant to mutual requests under Fed. R. Crim. P. 16. Defense counsel stated in the exchange that he anticipated calling no more than the two experts listed--neither of whom was Dr. Whitehurst. About the same time, the district court also approved an agreement under which both sides would turn over lists of all their possible witnesses at least three days before the start of their respective cases-in-chief. Dr. Whitehurst was not on the 390-person witness list that the defense provided before the start of its own case. Defense counsel also confirmed orally that he did not expect to call Dr. Whitehurst.

The government correctly notes that Mr. Nichols' defense team violated Fed. R. Crim. P. 16(b)(1)(C) when it failed to identify Dr. Whitehurst and provide a written summary of his testimony upon request. The rule states that a "defendant, at the government's request, must disclose to the government a written summary of testimony the defendant intends to use under Rules 702, 703 and 705 of the Federal Rules of Evidence as evidence at trial." Fed. R. Crim. P. 16(b)(1)(C) (1994). As we noted above,

the government made such a request, and Mr. Nichols' response on September 25, 1997 omitted Dr. Whitehurst. Mr. Nichols concedes there was a violation of the rule.

Mr. Nichols contends, however, that the exclusion of Dr. Whitehurst was not the proper remedy. Citing Fed. R. Crim. P. 16(d)(2), Mr. Nichols now argues the district court should have granted a continuance to permit the government to prepare for Dr. Whitehurst's testimony. Rule 16(d)(2) provides that in response to a violation of Rule 16(b)(1)(C), the court may "grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances." Fed. R. Crim. P. 16(d)(2) (1994).

The factors the district court should consider in determining whether a sanction is appropriate are (1) the reasons for the delay in producing the requested materials, including whether or not the party acted in bad faith; (2) the extent of prejudice to the other party as a result of the delay; and (3) the feasibility of curing the prejudice with a continuance. *See United States v. Wicker*, 848 F.2d 1059, 1061 (10th Cir. 1988). These factors are not exhaustive, nor is each necessarily required to support a sanction. *See Russell*, 109 F.3d at 1511. If the district court concludes sanctions are appropriate, it should impose the "'least severe sanction that will accomplish . . . prompt and full compliance with the court's discovery orders.'" *Wicker*, 848 F.2d at 1060 (quoting *United States v. Fernandez*, 780 F.2d 1573, 1576 (11th Cir. 1986)). But sometimes "[e]ven in the absence of prejudice, integrity and scheduling considerations alone may

- 21 -

justify suppression of otherwise admissible evidence offered by the delinquent party."
*Russell*, 109 F.3d at 1511.

It appears from the record that defense counsel's actions could suggest to the district court anything from bad luck to bad faith. Obviously, the district court weighed all the circumstances and arrived at a sanction it believed proper. Although not specifically mentioned by the court, there were a number of factors that support its conclusion.

Dr. Whitehurst's name was omitted not only from the defense's pretrial list of experts but also from the overwhelming list of 390 possible witnesses provided just before the start of the defense case. When the prosecution directly asked whether Dr. Whitehurst would be a witness, defense counsel orally confirmed that the defense did not expect to call him. The failure to list the doctor is especially troublesome in light of the fact Mr. Nichols' team was well aware of Dr. Whitehurst and his position on the government's expert conclusions. He was well known to the defense as a disgruntled FBI employee who held strong opinions about the quality of the FBI's forensic work in this and other bombing cases. In fact, much of this information became known to the defense nearly a whole year before Mr. Nichols' trial began, during a three-day deposition of Dr. Whitehurst conducted by Mr. Nichols' counsel in mid-December 1996. Dr. Whitehurst's views were also prevalent during his testimony as a defense witness in the McVeigh trial, an event Mr. Nichols' counsel observed.

More importantly, Dr. Whitehurst initiated contact with defense counsel at the last moment after the defense had given up on him as a helpful witness. At the same time, apparently no effort was made following the crucial testimony of the government's witnesses to contact Dr. Whitehurst to see if he had valuable information to impart.

All these circumstances suggest to us, as it must have to the district court, that when Dr. Whitehurst's testimony was offered, either Mr. Nichols' counsel changed their mind about the value of his testimony, or waited to the last minute to attempt to call him to provide the defense with a tactical advantage. The latter conclusion is certainly supported by the record. Having taken the effort to endorse 390 people as potential witnesses, one would assume the defense compiled its witness list in an abundance of caution. Not to have taken a similar caution to include a witness who had previously appeared as a defense witness in the companion case logically leads to the inference that a tactic was employed by very experienced and capable attorneys. Moreover, the notion that the defense was somehow lulled into its failure to endorse Dr. Whitehurst because it perceived his value as very limited rings hollow in light of the caution counsel exercised in the previous endorsement of 390 souls.

We reject Mr. Nichols' contention that "if bad faith is to be found, it was on the part of the government for intimidating a potential defense witness." We find no evidence in the record to suggest Dr. Whitehurst was actually prevented from offering his testimony. Indeed, the record reflects Dr. Whitehurst was difficult to intimidate, having

- 23 -

already given a three-day, pro-defense pretrial deposition, written scores of letters criticizing the FBI's conduct in this and other cases, and testified as a defense witness for Mr. McVeigh. Moreover, despite the "chilling" effect of the government's actions, Dr. Whitehurst actually volunteered his testimony. In light of these facts, we find it difficult to believe Dr. Whitehurst was intimidated into not testifying at Mr. Nichols' trial.

Whether a continuance would have been practicable and effective in this case is a close issue. But we think the issue is overshadowed by the trial court's legitimate scheduling concerns. The trial was already into its third month and was closely moving in on the holiday season. The court had made clear when it set the original trial date that it was concerned about the holidays interfering with the trial. Moreover, the court had hoped to proceed, depending on the jury's guilt-phase verdict, to a penalty phase before the holiday season. We have previously countenanced this sort of scheduling interest. "On occasion the district court may need to suppress evidence that did not comply with discovery orders to maintain the integrity and schedule of the court even though the [government] may not be prejudiced." *Wicker*, 848 F.2d at 1061. "A remedy that does not maintain that integrity and schedule does not accomplish . . . prompt and full compliance with the court's discovery orders." *Russell*, 109 F.3d at 1512 (internal quotation marks and citation omitted).

All matters considered, we conclude the district court acted within the bounds of its discretion when it refused to allow Dr. Whitehurst to testify. Mr. Nichols' claim the

exclusion violated the Due Process Clause of the Fifth Amendment appears insufficiently developed for consideration on appeal.

**V.      Did the District Court Err When it Admitted the Testimony of a Co-Conspirator who Testified in Exchange for Promises of Leniency?**

Mr. Nichols posits we should reverse his conviction because Michael Fortier testified against him at trial in exchange for traditional promises of leniency from the prosecution, all in violation of 18 U.S.C. § 201(c)(2).  He has been deprived of this argument by the en banc court.  ***See United States v. Singleton***, ___F.3d _____, 1999 WL 6469 (10th Cir. 1999) (en banc).

**VI.      Did Cumulative Errors Adversely Affect Mr. Nichols' Right to a Fair Trial?**

In his final claim regarding the guilt phase of his trial, Mr. Nichols argues the accumulation of all the errors committed in his case entitles him to a reversal of his conviction.  Because we have noticed no errors in the proceedings, there can be no cumulative error.  "Cumulative error analysis applies where there are two or more actual errors; it does not apply to the cumulative effect of non-errors."  ***Moore v. Reynolds***, 153 F.3d 1086, 1113 (10th Cir. 1998), ***petition for cert. filed***, ___ U.S.L.W. ___ (U.S. Jan. 15, 1999) (No. 98-7699).

**VII.  Did the District Court Err by Sentencing Mr. Nichols Under 1994 U.S.S.G. § 2A1.1--the Guideline for First-Degree Murder--Rather Than 1994 U.S.S.G. § 2K1.4--the Guideline for Arson and Property Damage By the Use of Explosives?**

In his first claim relating to sentencing, Mr. Nichols contends the district court erred when it sentenced him based on 1994 U.S.S.G. § 2A1.1, the guideline for first-degree murder, instead of 1994 U.S.S.G. § 2K1.4, the guideline for arson and property damage by use of explosives.  The 1994 Guidelines Manual Statutory Index[3] does not specify the guideline section or sections ordinarily applicable to 18 U.S.C. § 2332a.  *See* 1994 U.S.S.G. App. A.  Thus, the district court was required to "apply the most analogous offense guideline . . . [or,] [i]f there is not a sufficiently analogous guideline, [to sentence the defendant according to] the provisions of 18 U.S.C. § 3553(b)."  1994 U.S.S.G. § 2X5.1.

The district court stated it was inclined to apply section 2A1.1 as the most analogous guideline because the jury found that (1) the object of the conspiracy was to

---

[3]The trial court applied the 1994 Guidelines Manual instead of the 1997 manual, even though the latter was in effect at the time of sentencing.  The district court was correct in doing so.  The 1997 manual contains an adjustment that did not exist at the time of the offense.  *See* 1997 U.S.S.G. § 3A1.4.  Section 3A1.4 provides for a twelve level increase where the offense involves a "federal crime of terrorism," as that term is defined by 18 U.S.C. § 2332b(g)(5).  We have no doubt that section 3A1.4 would apply to Mr. Nichols' offense, *see id.* § 2332b(g)(5)(A), (B)(i), and that retroactive application of the adjustment would implicate the Ex Post Facto Clause.  *See United States v. Svacina*, 137 F.3d 1179, 1186 (10th Cir. 1998).  Accordingly, the district court was required to "use the Guidelines Manual in effect on the date that the offense of conviction was committed."  1997 U.S.S.G. § 1B1.11(b)(1).

use a weapon of mass destruction against persons inside the Murrah building, (2) death resulted from the conspiracy, and (3) the deaths were foreseeable. The court also equated Mr. Nichols' conduct to first-degree felony murder because the "deaths resulted in the course of the commission of a felony," namely, conspiring to use an explosive weapon of mass destruction. The court reasoned that "while the case, of course, was not tried on felony murder theory or approach and felony murder was, of course, not submitted to the jury, the situation now is different because we're not looking at the liability; we're looking at the punishment that is appropriate."

To properly analyze this issue, we believe we must first review the paradigm within which the district court applied the Guidelines in this case. Section 2X5.1 requires the trial court to "determine if there is a sufficiently analogous offense guideline, and, if so, to apply the guideline that is most analogous." 1994 U.S.S.G. § 2X5.1 comment (backg'd). Thus, the first step required the district court to determine whether *any* guideline, and there can be more than one, is sufficiently analogous to the defendant's crime of conviction. Whether there is a sufficiently analogous guideline to a particular crime is generally a task of comparing the elements of the defendant's crime of conviction to the elements of federal offenses already covered by a specific guideline. *See United States v. Allard*, 164 F.3d 1146, 1149 (8th Cir. 1999); *United States v. Osborne*, 164 F.3d 434, 437 (8th Cir. 1999). The determination on this point is a purely legal one, and the district court need not consider the underlying factual circumstances of

the defendant's case.  Accordingly, we review *de novo* the district court's decision regarding the first step of the inquiry.  *See id.*; *United States v. Gabay*, 923 F.2d 1536, 1545 (11th Cir. 1991).

Performing that review, we believe the district court was correct when it concluded, albeit implicitly, that section 2A1.1, as a matter of law, is sufficiently analogous to Mr. Nichols' offense of conviction.  Amendments to the Guidelines adopted after 1994 make clear the Sentencing Commission agrees.  In Amendment 534, the Commission added 18 U.S.C. § 2332a to the Guidelines' Statutory Index.  The Index now specifies, and has since November 1, 1995, that a violation of section 2332a may be handled under section 2A1.1, the first-degree murder guideline.  *See* 1998 U.S.S.G. App. A; 1995 U.S.S.G. App. A.  This clarifying amendment, which we may properly consider, *see* 1994 U.S.S.G. § 1B1.11(b)(2); *United States v. Van Krieken*, 39 F.3d 227, 231 n.2 (9th Cir. 1994), demonstrates the Commission's belief that section 2A1.1 is sufficiently analogous to an offense under section 2332a.  Notably, the Commission has also determined that the guideline Mr. Nichols proposes as appropriate, section 2K1.4, is sufficiently analogous as well.  *See* 1998 U.S.S.G. App. A.

Therefore, it was incumbent upon the district court to next determine which of these two guidelines was the *most* analogous.  The scope of this inquiry is a matter of contention, and the parties disagree about what information a court may consider in making this determination.  Citing section 1B1.2(a) of the Guidelines and case law from

other circuits, Mr. Nichols argues the most analogous offense should be determined solely from the "offense conduct charged in the count of the indictment or information of which the defendant was convicted."  1994 U.S.S.G. § 1B1.2(a); *see also United States v. Saavedra*, 148 F.3d 1311, 1316-18 (11th Cir. 1998); *United States v. Hornsby*, 88 F.3d 336, 338-39 (5th Cir. 1996); *United States v. Terry*, 86 F.3d 353, 357-58 (4th Cir. 1996).  The government, on the other hand, takes a broader position and contends the district court may look beyond the face of the indictment and properly consider the defendant's relevant conduct under section 1B1.3.  *See Osborne*, 164 F.3d at 438; *United States v. Marquardo*, 149 F.3d 36, 45 (1st Cir. 1998); *United States v. Clay*, 117 F.3d 317, 319-20 (6th Cir. 1997).  Our circuit has not squarely addressed this issue.  We have only suggested in dictum that "to determine which guideline is appropriate, the district court . . . should [examine] the indictment, the plea agreement, and the facts of the case."  *United States v. Henning*, 77 F.3d 346, 349 (10th Cir. 1996).  We leave resolution of the proper methodology for another day because utilizing either approach we are convinced the district court chose the appropriate guideline.[4]

### A.    The Face of the Indictment Approach

---

[4]Furthermore, we need not decide under what standard we should review a district court's selection of the most analogous guideline.  For the reasons set forth below, the district court's actions here pass muster under any standard.

The operation of Mr. Nichols' proposed approach was demonstrated in **Terry**. There, the defendants were charged and convicted under the Assimilative Crimes Act, 18 U.S.C. § 13(a), for firing a shotgun at an occupied vehicle while in a national forest. The driver of the vehicle escaped unhurt, but the vehicle sustained $2,869 in damage. No guideline expressly covered the offense of conviction so section 2X5.1 instructed the district court to apply the most analogous guideline. The district court applied the guideline for aggravated assault. **See** 1994 U.S.S.G. § 2A2.2(a).

On appeal, the defendants argued the district court should have applied the guideline for property damage or destruction. **See** 1994 U.S.S.G. § 2B1.3(a). The court of appeals disagreed. It began by stating that in "determining which guideline is most analogous, the sentencing court must . . . look to 'the offense conduct charged in the count of the indictment or information of which the defendant was convicted.'" **Terry**, 86 F.3d at 357 (quoting 1994 U.S.S.G. § 1B1.2(a)). The court then examined the indictment and noted it "charged that the defendants did unlawfully and *maliciously* shoot at an occupied vehicle, *putting in peril* the life of the occupant therein." **Id.** at 358. The court concluded:

> [W]e believe the indictment in this case describes conduct much more serious than simple property damage . . . . Here the indictment charges that the defendants acted with malice and that they actually imperiled the life of another person. We recognize that the conduct described in the indictment does not match the Guidelines' definition of aggravated assault perfectly, but a perfect match is not required. The defendants' argument fails because the conduct charged in the indictment is more like aggravated assault than like property damage or destruction.

- 30 -

*Id.*; *see also Saavedra*, 148 F.3d at 1314 (utilizing the same approach to compare guidelines). The *Terry* method informs our judgment here.

The pertinent count of conviction in Mr. Nichols' case is Count One of the indictment. Count One charges him with conspiring to use an explosive weapon of mass destruction in violation of 18 U.S.C. § 2332a. As part of the offense conduct charged in that count, the government alleges Mr. Nichols intended with premeditation to kill the persons in the Murrah building. Paragraph two alleges "[i]t was the object of the conspiracy to kill and injure innocent persons and to damage property of the United States." And paragraph thirty-eight of the same count further alleges Mr. Nichols intended the truck bomb explosion to result in death and personal injury. Given the indictment's allegations of premeditation and malice, we think it clear the conduct described in Count One is more like first-degree murder under section 2A1.1 than property damage under section 2K1.4. *See United States v. Kelly*, 1 F.3d 1137, 1140 n.2 (10th Cir. 1993) (describing requirements for first-degree murder). The district court did not err in selecting as it did.

We further hold that even if the indictment had omitted the allegations of intent to kill and premeditation, the first-degree murder guideline would remain the most analogous because the doctrine of felony murder would serve to imply the malice as a matter of law and obviate the need for premeditation. The felony-murder rule provides that an unintended death resulting from the commission or attempted commission of

- 31 -

certain felonies is murder in the first degree.  The doctrine circumvents the normal *mens rea* requirements of first-degree murder and requires only an intent to commit the underlying felony.  ***See United States v. Nguyen***, 155 F.3d 1219, 1229 (10th Cir. 1998), ***petition for cert. filed***, ___ U.S.L.W. ___ (U.S. Jan. 11, 1999) (No. 98-7669).  As we recently noted,

> [t]here is an intended felony and an unintended homicide.  The malice which plays a part in the commission of the felony is transferred by the law to the homicide.  As a result of the fictional transfer, the homicide is deemed committed with malice; and a homicide with malice is, by definition, common-law murder.

***United States v. Pearson***, 159 F.3d 480, 485 (10th Cir. 1998) (quoting 2 Charles E. Torcia, ***Wharton's Criminal Law*** § 147, at 296-97 (15th ed. 1994)).  The felony-murder rule also eliminates the need for a finding of premeditation.  ***See United States v. Antelope***, 430 U.S. 641, 644 (1977); ***Nguyen***, 155 F.3d at 1229; ***United States v. El-Zoubi***, 993 F.2d 442, 449 (5th Cir. 1993).

At present, the felony-murder rule is incorporated into 18 U.S.C. § 1111(a).  That statute provides in pertinent part that "[e]very murder . . . committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnaping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, burglary, or robbery . . . is murder in the first degree."  18 U.S.C. § 1111(a) (1994).  Typically, prosecutors utilize the doctrine at the guilt phase of a trial to garner a first-degree murder conviction.  But use of the rule is not so strictly limited.  The Sentencing Guidelines also incorporate the felony-murder

rule and provide that guideline 2A1.1 "also applies when death results from the commission of certain felonies." 1994 U.S.S.G. § 2A1.1 n.1. Indeed, our sister circuits have made use of the felony-murder rule at sentencing even where the case was not tried on a felony murder theory. *See, e.g., United States v. Tocco*, 135 F.3d 116, 130-31 (2d Cir. 1998); *United States v. Tham*, 118 F.3d 1501, 1505-11 (11th Cir. 1997); *United States v. Ryan*, 9 F.3d 660, 672 (8th Cir. 1993), *aff'd on reh'g en banc*, 41 F.3d 361 (8th Cir. 1994). Thus, a felony murder conviction is not a procedural prerequisite to use of the doctrine at sentencing.

Mr. Nichols argues that his most serious offense of conviction, conspiring to use a weapon of mass destruction, 18 U.S.C. § 2332a, cannot serve as the predicate felony because his offense is not listed among the triggering felonies in 18 U.S.C. § 1111(a). We disagree.

Initially, we note that courts are not bound by the constraints of section 1111(a) at sentencing. As the district court correctly observed, "the situation now is different because we're not looking at the liability; we're looking at the punishment that is appropriate." The Sentencing Guidelines' restatement of the felony-murder rule is not as limited as the articulation of the rule in section 1111(a). The Guidelines provide that guideline 2A1.1 "also applies when death results from the commission of *certain felonies*," 1994 U.S.S.G. § 2A1.1 n.1 (emphasis added), but the Guidelines do not delineate what felonies suffice. That decision is left for judicial determination. *See, e.g.,*

***Tocco***, 135 F.3d at 130-31 (suggesting section 1111(a) as indicative of which felonies are included as "certain felonies").

Recognizing that we are not bound by section 1111(a), we nevertheless think it appropriate to work within the scope of that statute. The doctrine of felony murder expresses a highly artificial concept that generally deserves no extension beyond its required application. ***See People v. Phillips***, 414 P.2d 353, 360 (Cal. 1966), ***overruled on other grounds by People v. Flood***, 957 P.2d 869 (Cal. 1998). In keeping with our desire not to unduly expand the doctrine, we hold our decision in the context of sentencing must be made with 18 U.S.C. § 1111(a) as a guide. Ultimately, our task is to determine whether Mr. Nichols' offense of conviction, *as charged and described in Count One of the indictment*, could serve as a predicate felony under section 1111(a). We believe it can.

The substantive offense of using an explosive weapon of mass destruction is functionally equivalent to the "arson" listed in 18 U.S.C. § 1111(a).[5] ***See United States v. Gullet***, 75 F.3d 941, 948-49 (4th Cir. 1996) (reaching the same conclusion with respect to cases involving explosive devices under 18 U.S.C. § 844(i)); ***United States v. Prevatte***, 16

---

[5]We recognize section 2332a does not always entail the use of an explosive device. Indeed, a "weapon of mass destruction" may also include, among others, a non-explosive weapon containing a disease organism or poisonous chemicals. ***See*** 18 U.S.C. § 2332a(b)(2)(B)-(C) (1994); 18 U.S.C. § 2332a(c)(2)(B)-(C) (Supp. III 1997). Whether use of those types of weapons is analogous to arson under 18 U.S.C. § 1111(a) is something we need not resolve. The indictment presently before us clearly alleges an explosive truck bomb.

- 34 -

F.3d 767, 779-82 (7th Cir. 1994) (same).  The court in **Prevatte** persuasively noted that

when death results, crimes involving explosive devices should be treated no differently

under the felony-murder rule than those involving arson.

> [T]o hold that a death caused by fire could be punished under the first
> degree murder guideline but that a death caused by a bomb was to be
> punished more leniently . . . would attribute to Congress a result that would
> be anything but realistic or rational.  We decline to attribute such a result to
> the legislative branch.

*Id.* at 782.  We agree with the Seventh Circuit's conclusion and extend its reasoning to an

offense involving explosives under 18 U.S.C. § 2332a.

The fact Mr. Nichols was convicted of *conspiring* to use an explosive weapon of

mass destruction, and was in fact acquitted of the substantive charge, does not alter our

conclusion.  Section 2332a makes no distinction between a person who uses a weapon of

mass destruction or conspires to use one.  The statute provides in pertinent part:

> A person who uses, or attempts or conspires to use, a weapon of mass
> destruction . . . shall be imprisoned for any term of years or for life, and if
> death results, shall be punished by death or imprisoned for any term of years
> or for life.

18 U.S.C. § 2332a(a) (1994).  Congress did not create different punishments for the

conspiracy or underlying substantive offense, leading to the inference it viewed the two as

equivalent in consequence and severity.  This is especially so because Congress normally

treats conspiracy as a crime punished by no more than five years of imprisonment.  *See* 18

U.S.C. § 371 (1994).  The legislature's special treatment strongly suggests we should not

distinguish between using an explosive weapon of mass destruction or conspiring to do so in determining the proper punishment in this case.

Furthermore, the felony-murder statute does not require actual commission of the predicate offense. Rather, the statute provides that inchoate offenses, such as an attempt to commit the crime, are also sufficient. *See* 18 U.S.C. § 1111(a) (1994). This lends further support for concluding that conspiring to use an explosive weapon of mass destruction, also a form of inchoate offense, may suffice as a predicate offense to felony murder. We understand there are degrees of inchoate offenses, and conspiracy requires much less than attempt. *See* Wayne R. LaFave & Austin W. Scott, Jr., ***Criminal Law*** § 6.4(c), at 530 (2d ed. 1986) ("[U]nder attempt law it must be shown that the defendant has taken . . . a 'substantial step' toward commission of the crime . . . . Conspiracy law, however, attacks inchoate crime at a far more incipient stage -- the crime of conspiracy is complete at the time of the agreement . . . ."). However, given the allegations of overt acts stated in the indictment, we are persuaded Mr. Nichols' actions were more akin to attempt and should not be treated any differently at sentencing.

We are satisfied our interpretation of 18 U.S.C. § 1111(a) in the context of sentencing promotes the rationale normally associated with the felony-murder rule. "Although often skeptical of the wisdom of the felony murder rule, courts and commentators generally agree that the rule was conceived to deter the commission of certain dangerous felonies. The felony-murder rule not only deters felons from killing

- 36 -

during crime, but also deters potential felons from committing the predicate offense in the first place." ***Tham***, 118 F.3d at 1509-10 (citations omitted). The underlying offense of which Mr. Nichols was convicted, conspiring to use an explosive weapon of mass destruction, as charged and described in Count One of the indictment, presents a great danger to the public. That Mr. Nichols was not convicted of the substantive offense does not mitigate the dangerousness of his actions. As has been stated by a respected commentator:

> [T]he act of reaching agreement with one or more other persons on an unlawful purpose is a clear[] manifestation of intent . . . . It is less likely that the defendant will turn back, for a conspirator who has committed himself to support his associates may be less likely to violate this commitment than he would be to revise a purely private decision. . . . The agreement also increases the danger to society, for by a division of labor the group is more likely to be able to bring about the criminal result. This is particularly true when the objects of the conspiracy are ambitious and elaborate.

LaFave & Scott, ***Criminal Law*** § 6.4(c), at 531 (internal quotation marks omitted); ***see also Callanan v. United States***, 364 U.S. 587, 593-94 (1961). Given the dangerousness of such an offense, we think it appropriate to attach the severe consequences of guideline 2A1.1 at sentencing.

Mr. Nichols refers us to ***United States v. Bedonie***, 913 F.2d 782 (10th Cir. 1990), for the proposition that the "any arson" language of 18 U.S.C. § 1111(a) is limited to the arson described in 18 U.S.C. § 81. Any extension of section 1111(a), he argues, would be

over-expansive and impermissible in light of ***Bedonie***.  We have reviewed that decision and find it inapposite.

In ***Bedonie***, the defendants were convicted of first-degree murder on a felony murder theory.  The defendants had set fire to two police vehicles while in Indian country, killing the persons inside.  The district court instructed the jury that it had to return a verdict of first-degree murder if it found the deaths resulted from the commission or attempted commission of arson.  The court defined arson by reference to a Utah statute.

On appeal, the defendants argued the trial court erred in relying on the Utah statute because that statute could not serve as the predicate to felony murder under 18 U.S.C. § 1111(a).  They contended the only proper predicate was 18 U.S.C. § 81, the federal arson statute, which by its own terms did not apply to setting fire to motor vehicles.  Because section 81 was inapposite on the facts, they argued, there could be no felony murder.  The government countered that the "any arson" language of section 1111(a) did not limit itself to the arson contemplated in section 81 and that the definitions of predicate crimes could be supplied by state statute.

We rejected both parties' arguments and affirmed the first-degree murder conviction.  Taking the government's argument first, we held that "in prosecuting a defendant for first degree murder under the 'felony-murder' provision of § 1111(a), the predicate crime shall be defined by reference to the appropriate *federal* statute." ***Id.*** at 789 (emphasis added).  We then went further and limited the "arson" listed in section

1111(a) to the federal crime defined in 18 U.S.C. § 81. To hold otherwise, we stated, would permit the government to "select the statute with the definition most favorable to prosecution." *Id.* at 788. Our decision next disposed of the defendants' argument that section 81 did not apply to motor vehicles. We held that "the plain and ordinary meaning of § 81 criminalizes the burning of a motor vehicle . . . [and that the] statute's terms provide[d] sufficient notice" of the criminality of such conduct. *Id.* at 790. Because the defendants violated section 81 and death resulted from the commission of that offense, we concluded the first-degree murder conviction was proper.

Thus exposing the particulars of the case, it becomes evident ***Bedonie*** does not bind us here. First, the proposition upon which Mr. Nichols relies--that the "any arson" language of 18 U.S.C. § 1111(a) is limited to 18 U.S.C. § 81--is dictum. ***Bedonie***'s resolution of the defendants' argument disposed of the case in toto. Thus, any discussion of proper predicate felonies was superfluous. Moreover, in ***Bedonie*** we were asked to decide only whether a state statute, the Utah statute, could define the predicate arson felony, and not whether federal statutes other than section 81 would suffice. Second, ***Bedonie*** does not purport to pertain to application of the felony-murder rule at sentencing. Therefore, Mr. Nichols' reliance on ***Bedonie*** is misplaced.

### B.     The Relevant Conduct Approach

The relevant conduct for which Mr. Nichols must be held accountable also supports the district court's conclusion to select guideline 2A1.1 over 2K1.4. The Guidelines provide that a defendant is responsible for, among other things, "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." 1994 U.S.S.G. § 1B1.3(a)(1). Thus, "in choosing the most analogous guideline, the district court must take into account all the circumstances of the case." *Osborne*, 164 F.3d at 438.[6]

It is evident from the record of the sentencing hearing that the district court took into consideration all of the relevant circumstances of the case. The court noted that the jury had found that (1) the object of the conspiracy was to use a weapon of mass destruction against the Murrah building and the persons inside, (2) death resulted from the

---

[6]Notably, if we were initially to apply section 2K1.4 as Mr. Nichols suggests, we would end up back where we started, with the only difference being that it would appear we would *have to* apply his relevant conduct to determine the most analogous offense. Section 2K1.4 contains a cross reference which provides that "if death resulted, or the offense was intended to cause death or serious bodily injury, apply the most analogous guideline from [the 2A guidelines] if the resulting offense level is greater than that determined above." 1994 U.S.S.G. § 2K1.4(c)(1). Moreover, section 1B1.3(a) provides that cross references such as those contained in section 2K1.4 must be applied in light of a defendant's relevant conduct. *See* 1994 U.S.S.G. § 1B1.3(a); *United States v. Tagore*, 158 F.3d 1124, 1128 (10th Cir. 1998); *United States v. Morgan*, 164 F.3d 1235, 1238-39 (9th Cir. 1999). Thus, in accordance with section 1B1.3(a), we would have to consider all relevant conduct to determine, among other things, the most analogous offense in Chapter 2A.

conspiracy, and (3) the deaths were a foreseeable result of Mr. Nichols' conduct.

Considering the record as a whole, we think there was sufficient information from which

the district court could infer that it was more likely than not Mr. Nichols harbored the

malice and premeditation necessary to bring the case under section 2A1.1 of the

Guidelines.[7]

The evidence presented to the jury and relied upon by the district judge at

sentencing establishes the malicious nature of Mr. Nichols' conduct. "[M]alice does not

require a subjective intent to kill, but may be established by evidence of conduct which is

. . . reckless and wanton[,] and a gross deviation from a reasonable standard of care, of

such a nature that [one] is warranted in inferring that [the] defendant was aware of a

serious risk of death or serious bodily harm." *Sides*, 944 F.2d at 1558 (internal quotation

marks and citations omitted); *see also United States v. Soundingsides*, 820 F.2d 1232,

1237 (10th Cir. 1987). Mr. Nichols reached an agreement with Mr. McVeigh and its

objective was to detonate a 3000-6000 pound truck bomb in front of the Murrah building.

Both defendants intended to use the bomb as a weapon of mass destruction against not

---

[7]Mr. Nichols makes much of the fact the jury acquitted him on counts of first- and second-degree murder. He argues the district court was bound by those dispositions and that we too must "respect" the jury's verdict. This argument is without merit. The acquittal on those counts does not preclude the government or the court from revisiting issues of malice and premeditation at a sentencing hearing governed by a lower standard of proof. *See United States v. Watts*, 519 U.S. 148, ___, 117 S. Ct. 633, 637-38 (1997); *see also United States v. Sarracino*, 131 F.3d 943, 950 (10th Cir. 1997) (acquittal on first-degree murder does not preclude use of first-degree murder offense level at sentencing).

only the building *but the persons inside*. Furthermore, as the jury found, the deaths were a foreseeable result of Mr. Nichols' conduct. Mr. Nichols was aware of a serious risk of death attending his conduct and his callous and wanton disregard for the persons inside the Murrah building more than suffices to show malice aforethought. ***See United States v. Joe***, 8 F.3d 1488, 1500 (10th Cir. 1993) (stating that malice aforethought may be based on one's callous and wanton disregard for human life).

Furthermore, the totality of the evidence in this case preponderates towards a finding of premeditation. The requirement of premeditation under section 1111(a) involves a prior design to commit murder. We have defined it as:

> The act of meditating in advance; deliberation upon a contemplated act; plotting or contriving; a design formed to do something before it is done. Decision or plan to commit a crime . . . before committing it. A prior determination to do an act, but such determination need not exist for any particular period before it is carried into effect.

***McVeigh***, 153 F.3d at 1198 (quoting ***United States v. Jenny***, 7 F.3d 953, 957 (10th Cir. 1993)). In the preceding paragraph, we described the scope and object of the criminal activity Mr. Nichols agreed to jointly undertake. The ambitious and elaborate nature of the scheme serves in itself as evidence of deliberation upon a contemplated act. As we noted in ***McVeigh***, once there has been a finding of malice aforethought, one would "have to find premeditation, simply because the method of murder employed--the bombing--could not have been implemented without an enormous amount of planning." ***McVeigh***, 153 F.3d at 1198. Moreover, the temporal extent of the premeditation was

confirmed by the jury. The jury found the government had proven beyond a reasonable doubt that the agreement to destroy the Murrah building and the persons inside was set in motion on or about September 13, 1994, seven months before the bomb was actually detonated. Mr. Nichols' involvement in the scheme persisted through April 1995, if not later. Given the circumstances of this case, the district court was correct to conclude that Mr. Nichols' offense conduct was most analogous to first-degree murder and section 2A1.1.

## VIII. Did the District Court Err by Failing to Make Findings Explaining Why it Chose not to Depart Downward Under 1994 U.S.S.G. § 2A1.1 n.1?

Assuming 1994 U.S.S.G. § 2A1.1 is the correct guideline, Mr. Nichols next argues that the court failed to "make findings regarding the defendant's mental state" in determining whether a downward departure is necessary. Section 2A1.1 n.1 states:

> If the defendant did not cause the death intentionally or knowingly, a downward departure may be warranted. The extent of the departure should be based upon the defendant's state of mind (*e.g.*, recklessness or negligence), the degree of risk inherent in the conduct, and the nature of the underlying offense conduct. However, the Commission does not envision that departure below that specified in § 2A1.2 (Second Degree Murder) is likely to be appropriate . . . .

1994 U.S.S.G. § 2A1.1 n.1. Mr. Nichols reads this note to require a district court to make findings regarding the defendant's mental state before deciding whether to depart. The only decision to reach the same conclusion is *United States v. Prevatte*, 16 F.3d 767, 784 (7th Cir. 1994).

- 43 -

We think *Prevatte* is wrongly decided on this point. Nothing in the guideline requires a district court to make any findings when deciding whether to depart. The section merely states that if a district court chooses to depart, the *extent* of that departure should be based on a number of enumerated factors. The initial determination of whether to depart at all under section 2A1.1 n.1 remains wholly discretionary, just as it is with all other decisions to depart. *See United States v. Edwards*, 159 F.3d 1117, 1131 (8th Cir. 1998) (discussing section 2A1.1 n.1); *Tocco*, 135 F.3d at 131 (same). Therefore, we cannot exercise jurisdiction to review a refusal to depart under section 2A1.1 n.1 unless the district court states or believes it does not have any authority to depart. *See United States v. Castillo*, 140 F.3d 874, 887 (10th Cir. 1998). Here, there is no dispute the trial court was aware of its authority to depart under section 2A1.1 n.1. The court simply chose in its discretion not to do so.

## IX. Did the District Court Fail to Consider Mr. Nichols' Personal Characteristics During Sentencing?

Mr. Nichols maintains the district court failed to give him "individual consideration" during sentencing. The argument stems from the fact the trial court stated:

> I do not impose judgment on Terry Nichols so much as respecting the man he is but what he's done. . . . And accordingly, the sentence that I am going to impose will be for the duration of his life and is based upon my view that anyone, no matter who that person might be, or what his background might be, who participates in a crime of this magnitude, has forfeited the freedoms that this government is designed to protect and defend.

- 44 -

The court also referred in passing to evidence pertaining to *Mr. McVeigh's* political beliefs. By stating as much as it did, Mr. Nichols argues, the "court utilized an incorrect legal analysis to arrive at a life sentence."

This claim is without merit. First, Mr. Nichols has not presented a single case, nor could we find any, which would require vacatur of the sentence under the circumstances of this case. The court's comments simply represent a view that the crime of conviction was so horrible that even the most innocent personal background would not mitigate in favor of a sentence less than life imprisonment. Furthermore, nothing indicates the court refused to consider Mr. Nichols' personal characteristics. In fact, the record suggests the contrary. The court stated: "I have, in thinking about what the appropriate sentence is for Terry Nichols, considered the separate evidence. I do not think it is appropriate to determine a sentence of Terry Nichols and match it with Timothy McVeigh['s]."

## X.    Did the District Court Err in Ordering $14.5 Million in Restitution?

Mr. Nichols next argues the district court erred in imposing $14.5 million restitution. In the district court, Mr. Nichols' counsel estimated the "vast economic losses" caused by the bombing exceeded $650 million. The actual cost of replacing the Murrah building today would be $34.9 million. The district court ordered restitution in the amount of $14.5 million, the original cost of the Murrah building, payable to the building's owner, the General Services Administration (GSA).

Mr. Nichols argues the order must be vacated for two reasons: (1) it violates the statutory requirement of showing his conduct in furtherance of the conspiracy directly harmed the GSA, and (2) the district court failed to consider Mr. Nichols' ability to pay and entered the order for punitive rather than compensatory purposes. We review the legality of a restitution order *de novo*. ***See United States v. Herndon***, 982 F.2d 1411, 1420 (10th Cir. 1992). Factual findings underlying a restitution order are reviewed for clear error and the amount of restitution for an abuse of discretion. ***See United States v. Rogat***, 924 F.2d 983, 984-85 (10th Cir. 1991).

The Victim Witness and Protection Act (VWPA) provides a court may order restitution to any victim of the offense. ***See*** 18 U.S.C. § 3663(a)(1)(A) (Supp. III 1997). In ***Hughey v. United States***, 495 U.S. 411, 413 (1990), the Supreme Court instructed the VWPA authorizes "an award of restitution only for the loss caused by the specific conduct that is the basis of the offense of the conviction." After ***Hughey***, the VWPA was amended in 1990 to provide:

> For the purposes of this section, the term "victim" means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C. § 3663(a)(2) (Supp. III 1997).

Mr. Nichols claims the restitution order was illegal under ***Hughey*** and the amended VWPA because: (1) the GSA was not a victim of the manslaughter convictions,

- 46 -

and (2) he did not place and detonate the bomb; therefore, his "conduct in furtherance of the conspiracy did not directly harm GSA." We find no merit in either point. The first is no point at all, and the second is unsupported.

"Federal courts possess no inherent authority to order restitution, and may only do so as explicitly empowered by statute." *United States v. Hensley*, 91 F.3d 274, 276 (1st Cir. 1996). Mr. Nichols argues the statutory language requiring the victim be "directly harmed" by the defendant precludes restitution in his case because he was merely a co-conspirator. He offers little authority to support this argument, and we have already ruled, "losses caused by the entire conspiracy, not just losses caused by those acts committed by the defendant, can be attributed to the defendant when the district court orders restitution." *United States v. Brewer*, 983 F.2d 181, 185 (10th Cir. 1993). Because Mr. Nichols was convicted of conspiring to use a weapon of mass destruction against the Murrah building and the persons inside, the order of restitution to the building owner was correct under *Brewer*.

Mr. Nichols contends *Brewer* is not controlling because it did not address the 1990 amendments to the VWPA. We disagree. As the Fourth Circuit has explained, "[n]othing in the plain language of [the amended] § 3663(a)(2) or its legislative history usurps the settled principle that a criminal defendant who participates in a conspiracy is liable in restitution for all losses flowing from that conspiracy." *United States v. Plumley*, 993 F.2d 1140, 1142 n.2 (4th Cir. 1993) (affirming restitution order under 18 U.S.C. §§ 3663-

- 47 -

3664 where defendant argued her actions did not directly harm a robbed bank because she only drove the getaway car); *see also United States v. Davis*, 117 F.3d 459, 463 (11th Cir. 1997) (not plain error to impose restitution on each member in conspiracy based on the acts of all).  We agree with and adopt the view of our sister circuits.  The district court did not err by holding Mr. Nichols is subject to full restitution.     The more difficult issue raised, however, is whether the district court properly considered Mr. Nichols' ability to pay restitution.  Under the VWPA, the court must consider "the amount of loss sustained by each victim as a result of the offense; and the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and other such factors as the court deems appropriate."  18 U.S.C. § 3663(a)(1)(B)(i) (Supp. II 1996).  The VWPA was amended in 1996 by the Mandatory Victim's Restitution Act (MVRA) which now requires restitution be ordered for crimes of violence "without consideration of the economic circumstances of the defendant."  18 U.S.C. § 3664(f)(1)(A) (Supp. II 1996).  The district court did not apply the amended version of the act because it found a constitutional impediment to doing so.  The basis for the district court's refusal to apply the MVRA is set forth in this bench ruling at the hearing of May 13, 1998, on restitution:

> [I]t is my view that the significant difference between these two statutes [the VWPA and MVRA] and the reason for the change is that this is a mandatory restitution order.  It is not dependent upon ability to pay now or in the future.  It does not relate really to the situation of the defendant at all but focuses directly on the victims and what is needed to compensate them for the consequences of the crime for which the sentence is being imposed.

- 48 -

I think that is different.  I think that is different in its thrust and effect; and accordingly, it is not to be applied in this case because to do so would be increasing the punishment for a crime in violation of the ex post facto prohibition in the Constitution.

Neither the government nor Mr. Nichols has directly taken issue with this ruling, but it has been raised in the brief of the amici who were present at and took part in the sentencing proceedings.

Amici argue that MVRA is not punitive in nature and therefore does not implicate the ex post facto prohibition.  The government also suggests we can apply the MVRA, but Mr. Nichols takes the opposite view relying on *United States v. Siegel*, 153 F.3d 1256, 1259-60 (11th Cir. 1998) (holding Ex Post Facto Clause barred application of MVRA to defendant whose criminal conduct occurred before the effective date of the statute) (citing holdings or dicta of the Second, Eighth, Ninth, and D.C. circuits), and *United States v. Edwards*, 162 F.3d 87, 92 (3d Cir. 1998) (same).  We believe under the circumstances, we must resolve the ex post facto question.  *See United States Nat'l Bank v. Independent Ins. Agents of America, Inc.*, 508 U.S. 439, 446 (1993) (stating court is not bound by the legal theories advanced by the parties but retains the power to identify the proper construction of the law).

We have held "[t]he VWPA's purpose is not to punish defendants or to provide a windfall for crime victims but rather to ensure that victims, to the greatest extent possible, are made whole for their losses." *United States v. Arutunoff*, 1 F.3d 1112, 1121 (10th Cir. 1993) (citing *United States v. Diamond*, 969 F.2d 961, 968 (10th Cir. 1992), and

- 49 -

*United States v. Rochester*, 898 F.2d 971, 983 (5th Cir. 1990)). In a case challenging a

restitution order awarding sums that had accrued before passage of the substantive statute

providing the basis for restitution, we held:

> The Constitution's explicit prohibition against ex post facto laws applies only to those laws that inflict criminal punishment. Mr. Hampshire's restitution order does not implicate the Ex Post Facto Clause because it does not inflict punishment upon him but rather seeks to compensate his child for his failure to pay his past due support obligation.

*United States v. Hampshire*, 95 F.3d 999, 1006 (10th Cir. 1996) (affirming restitution

ordered pursuant to Child Support Recovery Act) (internal quotation marks omitted).

This same view has been followed elsewhere as well. *See United States v. Newman*, 144

F.3d 531, 538 (7th Cir. 1998) (application of MVRA is not prohibited by the Ex Post

Facto Clause because it is not punitive in nature). We think the law in this circuit has

been established in *Hampshire* and *Arutunoff*,[8] and we are obliged to follow it.[9]

Therefore, we believe the district court erred in viewing restitution as a punitive act, thus

leading it into the albeit logical but nonetheless erroneous conclusion it could not apply

the MVRA.

---

[8] Although *United States v. Hampshire*, 95 F.3d 999 (10th Cir. 1996), did not consider the MVRA and *United States v. Arutunoff*, 1 F.3d 1112 (10th Cir. 1993), was decided under the VWPA, the logic of these cases is patently applicable to the MVRA.

[9] In doing so, we accept the view of the Seventh Circuit that the Ex Post Facto Clause does not bar application of the MVRA to a defendant whose criminal conduct occurred before the effective date of the statute and reject the views of the Second, Third, Eighth, Ninth, Eleventh and D.C. circuits to the contrary.

The district court was not required to consider Mr. Nichols' financial condition under 18 U.S.C. § 3664(f)(1)(A), thus mooting the issue raised by Mr. Nichols on appeal. Although disagreeing with the district court in the route it followed, we nonetheless affirm its judgment in assessing restitution against Mr. Nichols. *See United States v. Sandoval*, 29 F.3d 537, 542 n.6 (10th Cir. 1994) (stating we are free to affirm the district court on any grounds for which there is a supportive record). Although Mr. Nichols argues restitution in this instance was entered for "punitive, even vindictive, purposes rather than to compensate victims," we are not persuaded. The government, as we have already noted, was a victim of the conspiracy, and it was entitled to compensation for its loss.

**XI.    Is the District Court's Judgment Fatally Defective Because it Fails to Enter Judgment on Some of the Jury's Verdicts of Acquittal?**

Lastly, Mr. Nichols states: "[T]he district court's judgment is fatally defective because it fails to enter judgment on the jury's verdicts of acquittal. This failure poses a serious threat to Mr. Nichols' double jeopardy rights, and requires that the judgment be vacated and the case remanded, regardless of what action this Court may take on the other issues presented."

The judgment entered in this case states, in pertinent part, that the "defendant has been found not guilty on Counts Two [use of a weapon of mass destruction, 18 U.S.C. § 2332a] and Three [destruction by explosives, 18 U.S.C. § 844(f)] and is discharged as

- 51 -

to such counts." The judgment fails, however, to state the jury acquitted Mr. Nichols on the offenses of first- and second-degree murder in Counts Four through Eleven.

Mr. Nichols complains of no more than a clerical error, and we need not vacate the judgment to correct the omission. *See* Fed. R. Crim. P. 36 (1994). Rule 36 provides the district court may at any time correct clerical mistakes in judgments arising from oversight or omission, even while a case is pending on appeal. Thus, the preferred remedy for correcting such a clerical error would have been a motion brought before the district court under Rule 36. *See **United States v. Wach***, 907 F.2d 1038, 1041 (10th Cir. 1990). Because counsel failed to take advantage of this simple remedy, we believe it sufficient here to call the oversight to the attention of the district court. It may then properly perform the purely ministerial task of correcting the judgment *sua sponte*. *See **United States v. Corey***, 999 F.2d 493, 497 (10th Cir. 1993).

In all other respects, the judgment of the district court is **AFFIRMED**.